```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    CELSIS IN VITRO, INC.,          )  No. 10 C 4053
                                      )
 4                    Plaintiff,      )  Chicago, Illinois
                                      )  September 7, 2010
 5                                    )  10:00 o'clock a.m.
      -vs-                            )
 6                                    )
                                      )
 7    CELLZDIRECT, INC., et al.,      )
                                      )
 8                    Defendants.     )

 9
              TRANSCRIPT OF PROCEEDINGS - RULING
10           BEFORE THE HONORABLE MILTON I. SHADUR

11    APPEARANCES:

12    For the Plaintiff:      LOEB & LOEB LLP
                              321 North Clark Street
13                            Suite 2300
                              Chicago, Illinois 60654
14                            BY:  MR. JORDAN SIGALE
                                   MR. ADAM G. KELLY
15                                 MS. JULIE L. LANGDON

16    For the Defendants:     HILLIS CLARK MARTIN PETERSON, P.S.
                              1221 Second Avenue
17                            Suite 500
                              Seattle, Washington 98101
18                            BY:  MR. LOUIS D. PETERSON
                                        and
19                            LIFE TECHNOLOGIES CORPORATION
                              5791 Van Allen Way
20                            Carlsbad, California 92008
                              BY:  MR. RIP FINST
21                                 MR. SCOTT MILLER

22

23    Court Reporter:         ROSEMARY SCARPELLI
                              219 South Dearborn Street
24                            Room 1412
                              Chicago, Illinois  60604
25                            (312) 435-5815
```

1        THE CLERK:  This is 10 C 4053, Celsis In Vitro

2    versus CellzDirect.

3        THE COURT:  Mr. Peterson, I understand you are on

4    the line, although we have some problem with our phone, and

5    so I hope that you are going to be able to hear everything

6    that is said because we are not --

7        MR. PETERSON:  Good morning, your Honor.  Your

8    Honor, this is Lou Peterson on behalf of the defendant.  And

9    so far I can hear you just fine.

10        THE COURT:  Okay.  How about counsel here in court.

11        MR. SIGALE:  Good morning, your Honor, Jordan

12    Sigale, Adam Kelly and Julie Langdon on behalf of the

13    plaintiff.

14        MR. FINST:  Rip Finst and Scott Miller for Life

15    Technologies, along with Mr. Peterson on the phone, your

16    Honor.

17        THE COURT:  Good morning to all of you.

18        You know, I must say that until this case I never

19    really had captured what in my mind's eye I had always

20    thought about the patent concept of prior art in which you

21    picture the inventor sitting in a room at a desk with the

22    walls festooned with the prior art.  And that, of course, is

23    a concept that involves the inventor is bound to know the

24    prior art.  The reason I say that is I now appreciate it

25    because I am surrounded and blocked by all of the papers that

1    you people have inflicted on me and I feel like the inventor.

2          Well, the other thing I wanted to say at the

3    beginning was that I had, as you know, indicated that I would

4    be giving my ruling orally, with the anticipation that I

5    might then reduce it to a written form as an opinion.  What I

6    typically do whenever I deliver an oral ruling to make notes

7    for myself, usually in the form of a -- an outline that tells

8    me when I ought to be moving from here to there, and then to

9    supplement that for myself with some more detailed notes as

10   to things that I want to be particularly careful about

11   touching on.

12          In this instance, partly because of the complex

13   vocabulary involved, I guess more than the complexity of

14   issues, what I started to do was to dictate something so that

15   my secretary could transcribe that.  And I have ended up with

16   a totally dictated and totally transcribed sort of script for

17   myself, and I am going to be going through that.

18          The net result of that is I am not going to be

19   publishing an opinion.  I have provided the court reporter

20   with the text of what I am going to be talking about now,

21   which all of you are going to be able to hear, and that is

22   going to represent essentially my opinion.

23          So let me begin by saying that it is difficult to

24   know just where to begin.  And I say that because the

25   defendants have launched such a multi-layered attack on the

1    Celsis patent.  But what I have chosen to do is to begin with

2    the issue of infringement rather than perhaps the more

3    logical threshold subject of patent validity, primarily

4    because the former is more unitary and thus, as I think of

5    it, more readily dispatched, while the question of patent

6    validity, as we know, is divided into a number of issues.

7            As to infringement, Dr. Strom carefully spelled out

8    the parallels between the defendant's acknowledged steps and

9    the teaching of the patent, while on the other side of the

10   coin defendants really didn't offer anything in the way of

11   opinions to address the proper interpretation of the patent's

12   claims.  In attempted response, the director of marketing

13   Markus Hunkeler asserted unpersuasively that their

14   centrifugation step is not the "density gradient

15   fractionation" step referred to in element A of Claim 1.

16   That is really a departure, as I think of it, from the normal

17   English language meaning of the words.  For example, just

18   look up gradient in Webster's Third New International

19   Dictionary, which comports with the common understanding and

20   the common sense reading of that word.  With no impertinence

21   intended, it really put me in mind of the classic Humpty

22   Dumpty ipse dixit in which everybody remembers from Alice in

23   Wonderland.

24           "When I use a word," Humpty Dumpty said, in rather

25   a scornful tone, "it means just what I choose it to mean,

1   neither more nor less."  "The question is," said Alice,

2   whether you can make words that mean so many different

3   things."  The question is," said Humpty Dumpty, "which is to

4   be master -- that is all."

5        Then the defendants attempt to fall back on a

6   specious argument that if they do indeed practice density

7   gradient fractionation in the first instance, then what they

8   recommend to their customers as part of the washing step

9   after the final thaw would also be a density gradient step

10  within the meaning of Claim 1's step C.  On that score

11  defendants advance the contention that I spoke of the other

12  day when I characterized that position that was advanced in

13  Footnote 4 at Page 5 of the post-hearing brief as hokum.  It

14  is they and not Celsis who "attempt to rewrite the 'a density

15  gradient step' limitation," in the language that they employ

16  in the text on that same Page 5.

17       All of this could be elaborated further, but it is

18  really not necessary to do that, for I found that the more

19  detailed exposition at Pages 2 through 4 of the Celsis

20  post-hearing memorandum has accurately provided chapter and

21  verse on that subject.  Just a few words ought to be said

22  about defendants' contention that the Celsis presentation is

23  flawed because neither it nor its opinion witnesses actually

24  tested or performed the defendants' accused processes to show

25  infringement.  Celsis correctly responds in part that this

1   newly-advanced contention by defendants is not supported by

2   the authorities that defendant cite in the context of a

3   preliminary injunction proceeding.  But even if that were not

4   the case, the argument is without merit in any event.

5   Indeed, it is really an obvious straw man.

6           To begin with, defendants, of course, know the

7   methods that they use in detail, and everyone has agreed that

8   the commodity in which the parties deal, hepatocytes, is in

9   short supply.  It is painfully obvious from the Stalingrad

10  defenses that defendants have offered, retreating street by

11  street, as their objections are overcome, that if Celsis had

12  sought to replicate their methodology, it no doubt would have

13  been confronted with the contention that the Celsis people

14  hadn't performed the steps in precisely the same way

15  defendants do.

16          If defendants are not in fact practicing the

17  methods taught in the patent -- remember that the "wherein"

18  limitations provide a kind of roadmap, as I have said

19  earlier, for practicing around the patent without

20  infringement -- it would have been a simple matter for

21  defendants to demonstrate that -- and, if that were true, to

22  extricate themselves from this litgation.  Now, this isn't a

23  matter of shifting the burden of production on the subject of

24  infringement, which I find Celsis has more than met for the

25  reasons already discussed, it is rather the relative ease of

1    showing their own methodology that defendants ignore by

2    making that argument.

3            In sum, it is an understatement to say that Celsis

4    has shown substantially more than a reasonable likelihood of

5    success on the subject of infringement.  So I turn to the

6    multifaceted subject of the patent's validity.

7            In that respect I think it appropriate to begin

8    with the issue of obviousness, because, if I can be pardoned

9    an element of satire, it is also so painfully obvious that

10   what is urged is a case of second-guessing or of sheer sour

11   grapes.  Instead of a more candid "Why didn't I think of

12   that", we get "Anybody reasonably skilled in the art would

13   have thought of that."

14           Yet look at the facts.  It is startling -- or at

15   least it was startling for me to learn the vast proliferation

16   of authors and articles dealing with hepatocytes and use of

17   cryopreservation, a combination about which I was thankfully

18   blissful and blissfully ignorant until this case came along,

19   but not a single one of that astonishingly large body of

20   literature was devoted to the subject of

21   multi-cryopreservation of hepatocytes -- and I have properly

22   laid stress on "multi."

23           That was not the subject of numerous articles

24   authored or assembled by Dr. Li or Dr. Gupta or by any of the

25   other scientists who participated in the consortium about

1   which Dr. Li testified, or for that matter by anybody else.

2   All defendants have come up with instead is a wisp of a term

3   that is buried in the Mahli article of which Dr. Gupta was

4   the co-author.  Just look at the title of that article,

5   Isolation of Human Progenitor Liver Epithelial Cells with

6   Extensive Replication Capacity and Differentiation into

7   Mature Hepatocytes, or at the article's preliminary summary

8   which also makes no mention of the subject that is now at

9   issue in this case or of the text in the article itself,

10   which after five pages of closely packed discussion includes

11   a sentence that uses the term "repeated cryopreservation" in

12   the context of mentioning high viability.  I am well aware of

13   the standards applied by the Federal Circuit in dealing with

14   prior art, nothing in that skeletal reference suggests or

15   even hints at the advance conceived of by the inventor here

16   and embodied in Claim 1.

17        Except in the world of second guessing and

18   hindsight in which defendants seek to operate, that snippet

19   in the Mahli reference neither foreshadowed nor rendered

20   obvious the concept that Dryden originated and became the

21   subject of the '929 patent.  Perhaps the best evidence of the

22   poverty of defendants' obviousness argument is exposed by the

23   manner in which defense counsel portrays that argument at

24   Pages 8 and 9 of defendants' own post-hearing brief.

25        Listen to this -- and I read it in detail because

1  of what I think is the telltale aspect of it.  LTC

2  established that asserted claims are merely "the combination

3  of familiar elements according to known methods" that "yield

4  predictable results" and, therefore, are obvious over the

5  prior art.  See KSR International against Teleflex.  It is

6  undisputed that every step of the Claim 1 method,

7  cryopreserving hepatocytes, thawing cryopreserved hepatocytes

8  and density gradient fractionation, was well-known in the

9  prior art.

10  The inventor, Daniel Dryden, admitted that each of

11  these steps was well established in the art by April of 2005

12  and that he did nothing new or different with respect to any

13  of the steps.  Celsis' expert, Dr. Strom, likewise admitted

14  that use of density fractionation to separate viable and

15  nonviable cells was "well established to everyone in this

16  field" and a person of ordinary skill in the art would have

17  known and fully expected that the viability of cryopreserved

18  hepatocytes could be substantially enhanced with density

19  gradient fractionation.  According to  Dr. Strom, "a person

20  of ordinary skill would believe that you could get very high

21  viability using a Percoll separation, and everybody is going

22  to expect this as the result."  That is the end of the quote.

23  But remember that, of course, is not the point.

24  What was not obvious to a person of order skill in the art

25  was that the absence of a Percoll separation at the stage

1  described in step C of Claim 1 was described there as

2  "without inquiring a density gradient step after thawing the

3  hepatocytes for a second time was new, was conceived and

4  developed by Dryden and had not been thought of or

5  accomplished by any of the gurus who had been writing and

6  publishing extensively on related topics before Dryden came

7  up with his novel method.  Again Dr. Li's revisionist

8  history is unpersuasive, and again Celsis has demonstrated

9  more than a substantial likelihood of success on the issue.

10        Next I turn to defendants' contention of patent

11  invalidity due to the lack of compliance with the "written

12  description" requirement as expounded in the en banc decision

13  in Ariad Pharmaceuticals against Eli Lilly & Company.  In

14  that respect defendants point to the amendment of the

15  patent's claims to add limitation overcome the patent

16  Examiner's then asserted obviousness rejection, so as to

17  secure allowance of the issued claims.  On that score,

18  defendants' post-hearing brief acknowledges this at Page 6.

19  Adding limitation to claims during prosecution is not per se

20  impermissible; in fact, it is a standard part of the patent

21  process.

22        In those terms anything that goes beyond the

23  original claim and that has no basis in the original

24  disclosure is necessarily invalid.  Here, however, the

25  limitations at issue are negative limitations, which can also

1   pose a problem if they introduce a "new concept" into the

2   originally-filed patent application.  But on that score the

3   post-hearing brief of Celsis at Pages 10 and 11 responds that

4   "The originally-filed patent application disclosed plating

5   the multi-cryopreserved hepatocytes after thawing them,"

6   while Example 1 in that same application taught no plating

7   step between the first and second cryopreservations.  Indeed,

8   defendants' own opinion witness, Dr. Gupta, agreed that the

9   prior art teaches when to plate, and he offered nothing to

10  indicate that plating was somehow a new concept to the

11  originally-filed application.

12          So I decline defendants' invitation to second-guess

13  the Examiner through a restructuring of the record to fit the

14  defendants' Procrustean bed.  Once more Celsis has met the

15  likelihood of success standard.

16          Finally in substantive terms, I turn to defendants'

17  contention that the patent is unenforceable because of

18  asserted inequitable conduct in the prosecution of the

19  application.  Although this is in some sense a digression, I

20  have read with interest a special report in the August 16th

21  issue of the National Law Journal on the Federal Circuit's

22  scheduled en banc hearing in Therasense against Becton,

23  Dickinson on whether to change the standards for proving

24  inequitable conduct.  The now vacated opinion in Therasense

25  was reported at 593 F.3d. 1289.  It will, of course, be

1    interesting to see the result of that en banc hearing, but in

2    the interim, of course, I am going to deal with the standard

3    as it has been announced and applied in the current case law.

4            Now, in that regard Titan Tire against Case New

5    Holland teaches that alleged infringers such as defendants do

6    not need to prove invalidity at the preliminary injunction

7    stage by the same clear and convincing standard that will be

8    imposed at the trial on the merits.  Instead, as Titan Tire

9    explained at Pages 1379 to -80 -- and this is a quote --

10   "Thus, when analyzing the likelihood of success factor, the

11   trial court, after considering all of the evidence available

12   at this early stage of the litigation, must determine whether

13   it is more likely than not that the challenger will be able

14   to prove at trial, by clear and convincing evidence, that the

15   patent is invalid.  We reiterate that the clear and

16   convincing standard regarding the challenger's evidence

17   applies only at trial on the merits, not at the preliminary

18   injunction stage.  The fact that, at trial on the merits, the

19   proof of invalidity will require clear and convincing

20   evidence is a consideration for the judge to take into

21   account in assessing the challenger's case at the preliminary

22   injunction stage; it is not an evidentiary burden to be met

23   preliminarily by the challenger.

24           Now, here the defendants point to the omission of a

25   portion of the Terry article from the quotation submitted in

1   the course of the patent prosecution.  To that end I have

2   looked at the subject through the lense prescribed by the

3   Orion case -- Orion -- Orion, rather -- Orion against Hyundai

4   Motor, which requires a showing of, one, affirmative

5   misrepresentations of a material fact, failure to disclose

6   material information or submission of false material

7   information; and, two, an intent to deceive the United States

8   Patent and Trademark Office.

9           Materiality of a submission, or in this case of an

10  omission, does not flow automatically from the submission or

11  omission itself.  In this instance neither of defendants'

12  opinion witnesses, Drs. Li and Gupta, provided any evidence

13  of materiality.  Instead only Dr. Strom addressed the

14  subject, and he testified that the omissions from Terry

15  itself and the references cited in Terry (deSousa and Ulrich)

16  disclose nothing more than the prior art already before the

17  Examiner.

18          Moreover, the Examiner's own handling confirmed

19  that, when considering the subject of obviousness, the

20  Examiner cited and quoted from a portion of Terry different

21  from the section to which the defendants point.  It is

22  obvious that she read and applied Terry itself, not just the

23  portion quoted by the applicant.

24          Nor have defendants supported their claim of a

25  misrepresentation in the patent applicant's June 2008

1  statement that "no one had been able to successfully multi-

2  cryopreserve hepatocytes.  Once against presentation at

3  Pages 13 and 14 of Celsis's post-hearing brief is successful

4  in heading off defendants' contention.

5          Needless to say, I have read the Federal Circuit's

6  month-old opinion in Ring Plus against Cingular Wireless and

7  it does not call for a different conclusion.  Indeed, wholly

8  unlike this case, the Ring Plus court had before it both

9  objective evidence and opinion testimony that confirmed a

10  misrepresentation of material fact as to what was there the

11  most relevant prior art reference.

12          Even more trenchantly though, however, Ring Plus

13  does not, as defendants seem to urge, perforce pronounce a

14  death sentence even if acclaimed infringer were to meet its

15  burden as to both materiality and intent.  To the contrary,

16  Ring Plus -- and this is at page -- at *2 of the Westlaw

17  citation -- reconfirms the prior Federal Circuit teaching

18  "The District Court must still balance the equities to

19  determine whether the applicant's conduct before the PTO was

20  egregious enough to warrant holding the entire patent

21  unenforceable."

22          That is just what I have done here, and the

23  equitable balancing process tilts heavily in Celsis's favor

24  and against defendants.  So here too defendants' assault on

25  the validity of the patent fails.

1    So I have come at last to the end of the

2    substantive road.  I confirm that Celsis has more than met

3    the need to demonstrate a reasonable likelihood of success on

4    the merits.  And less time and a less detailed explanation

5    are needed to deal with the other factors applicable to the

6    granting of preliminary injunctive relief.

7    In that respect the Federal Circuit, like our own

8    Court of Appeals, requires a movant for preliminary

9    injunctive relief to show, one, irreparability of harm; two,

10    that the balancing of harms favors the movant, that is, the

11    harm to the plaintiff if preliminary injunctive relief is

12    wrongfully denied is greater than the harm to the defendants

13    if such relief is wrongfully granted; and, three, that the

14    public interest weighs in favor of the grant of injunctive

15    relief.  And in that last regard the question in a patent

16    case must be looked at in light of the "strong public policy

17    favoring the enforcement of patent rights."  That is a quote

18    from PPG Industries against Guardian Industrial.

19    As for the first of those criteria, defendants

20    argue unpersuasively that the potential for recovery of the

21    damages negates the irreparability of harm.  That, of course,

22    is not so, for the deterioration in market price that takes

23    place, as it did here, when a competitor can stay in the

24    market by unlawfully practicing a patent method creates

25    permanent harm by destroying the lawful monopoly to which the

1    older of a valid patent is entitled as a matter of law.

2          Think, for example, of the effect of competing for

3    price against a presumptively unlawful competitor, as has

4    actually taken place here.  For example, the effect on

5    customer goodwill when an effort is later made to restore the

6    original price, and when ongoing customer relationships are

7    important, as defendants themselves have urged.  Think as

8    well of the impact of the improperly depressed price on

9    future business if defendants engineer around the patent, as

10   its limitations make possible, so that competition then

11   becomes legitimate and the issue becomes one of competing as

12   to quality while trying to counter the impact of the earlier

13   illegitimate competition.

14          Moreover, in terms of the proof of damages, I am

15   reminded of what I said nearly two decades ago in a

16   preliminary injunction proceeding that involved trademark

17   infringement, obviously not parallel, but implicating

18   somewhat similar consideration.  Here is what I said in

19   response to a like argument about the adequacy of damages

20   rather than injunctive relief if the context of

21   irreparability of harm in a case called Instrumentalist

22   against Marine Corps League.  Parenthetically that involved

23   the John Philip Sousa aspect of the magazine and the League

24   itself.

25          But here is what I said:  "There is no effective

1   way to measure the loss of sales or potential growth -- to

2   ascertain the people who don't knock on the door or to

3   identify the specific persons who do not reorder because of

4   the existence of the infringer."  That language was later

5   picked up by our Court of Appeals in a case that, although I

6   didn't get a chance to -- as I recall, it was Hyatt Hotels

7   against Hiatt.

8         On the other side of the coin, any asserted harm to

9   CellzDirect has been taught by PPG to be of lesser scope

10  under such circumstances, as well as being protectable by a

11  bond.  Plainly the balancing of harms tilts heavily in

12  Celsis's favor, and I am prepared to discuss quantification

13  of the appropriate bond at the parties' earliest convenience.

14        But, lastly, I have already referred to the PPG

15  teaching of a strong public policy favoring the enforcement

16  of patent rights.  In sum, all of the necessary components

17  for the granting of preliminary injunctive relief have

18  aligned themselves in Celsis's favor, and I therefore grant

19  motion for such relief.

20        That, however, is not the end of the story for the

21  last two filings by the litigants have also spoken to the

22  precise leave to be granted.  First, defendants have urged

23  that if a preliminary injunction is granted, I should couple

24  it with a stay pending appeal.  That, however, would

25  effectively turn the decision I announced on its head, for it

1    requires defendants to show, one, the existence of a strong

2    showing of their likely success on the merits; two, that they

3    will be irreparably injured absent a stay; three, that the

4    issuance of a stay would involve no substantial injury to

5    Celsis; and, four, that the public interest operates in

6    defendants' favor.  All of that is taken from Standard Havens

7    Products against Gencor Industries, quoting and applying the

8    standards announced in Hilton against Braunskill.  So I

9    decline the defendants' submission in that respect.

10            Finally, the defendants' post-hearing brief at

11   Pages 17 and 18 essentially seeks to dictate the express

12   terms of the preliminary injunction in a way that Celsis

13   describes as seeking an advisory opinion to assist defendants

14   in their efforts to design around the '929 patent.  On that

15   score the only contention that strikes me as having force is

16   the argument that defendants should not be barred from

17   marketing any pooled cryopreserved human hepatocytes made

18   before the patent's issuance on October 20, 2009.

19            To that end the defendants have cited the holdings

20   in Mycogen Plant Science against Monsanto and Monsanto

21   against Syngenta Seeds.  I read both of those.  And it is

22   quite true that the first and more thorough of those two

23   opinions has been vacated, although on other grounds, by the

24   Supreme Court, so that its status as precedent might perhaps

25   be viewed as somewhat uncertain.  But I noted that second and

1    more recent case essentially reconfirmed the holding, so on

2    that subject on balance I believe it appropriate to follow

3    those cases, but that, of course, requires a showing that

4    defendants did not make during the course of the hearing.

5    And I will leave it to counsel, when I get through in about

6    30 seconds, to tell me what I have to do about that.

7           Well, that is the end of the road, as far as I am

8    concerned.  What remains is the preparation and submission of

9    an appropriate form of injunctive order, plus a determination

10   as to the appropriate amount of any bond.  And, of course,

11   that is a subject that interacts with that last ruling that I

12   made in the defendants' favor.  Obviously, to the extent that

13   they are able to market things that were -- that were

14   developed before the issuance of the patent, that has

15   lessened materially any potential harm to the defendants.  So

16   those things interact.

17          So at this point I am ready to hear from counsel,

18   and I suppose that it is more logical in the first instance

19   to hear from plaintiff's counsel on the subjects that I have

20   identified here on the one aspect on which I have ruled

21   against the plaintiffs, and also on the subject of bond

22   which, as I say, as I would view would interact with the

23   question that the defendants have not really answered -- they

24   have raised -- and that has to do with any product that was

25   indeed within the scope of those two cases that I referred

1    to.

2            So let me hear from plaintiff's counsel, if I may.

3            MR. SIGALE:  Thank you, your Honor.  With respect

4    to the one issue that you raise, we would submit that that is

5    answered by Claim 10 of the patent, which you did not make

6    findings on.  We had submitted both Claims 1 and Claim 10 of

7    the '929 patent.  Claim 10 is a method of utilizing

8    hepatocytes that are made in accordance with --

9            THE COURT:  Yeah, I -- I am sorry that I

10   concentrated on 1.  Basically I viewed -- I shouldn't say as

11   a caboose, it is not.  But it seems to me precisely the same

12   line of analysis that I apply in terms of rejecting claims of

13   invalidity, I was really focusing -- although I framed it in

14   terms of 1, it obviously applied with equal force to Claim

15   10.

16           MR. SIGALE:  Claim 10, your Honor, is a method of

17   testing for certain antibiotics.  And so to the extent that

18   the defendants would be selling the multi-cryopreserved

19   hepatocytes for extensive use by its customers to practice

20   that method, they would be inducing infringement or

21   contributing to infringement by the sale of that.  That is

22   not controlled by either the Monsanto or the Mycogen opinion,

23   because what they would be doing is making a sale now for the

24   customers to practice.

25           THE COURT:  Well, I think the same thing could be

1   said vis-à-vis Claim 1, that is, that the patent in place

2   now, you know, talks -- the statute, make, use or sell.

3   Okay?  So a sell is -- is as much a claim violation as make.

4   And yet the Patent Office distinguished those -- those

5   aspects by saying that something that got generated before

6   the patent issued may, nonetheless, be sold post-issuance.

7           MR. SIGALE:  I understand your point, your Honor,

8   but the point of Monsanto and the point of the method claims,

9   the only way to infringe a method claim is by using the

10  method.  You can't sell the method.  You can't --

11          THE COURT:  I know that.

12          MR. SIGALE:  So the point I am making with respect

13  to Claim 10 is that when the customer set out to use

14  CellzDirect's multi-cryopreserved hepatocytes tomorrow, let's

15  say -- let's say hypothetically that there were

16  multi-preserved -- multi-cryopreserved hepatocytes made a

17  year ago.  That would have been before the patent issued.  If

18  they sell them today and the customers go to use them

19  tomorrow to test this antibiotic, which is the primary use of

20  these multi-cryopreserved hepatocytes, then they would be

21  using the multi-cryopreserved hepatocytes to practice the

22  method of Claim 10 post patent issue.  That would be the

23  infringement.  And so selling the multi-cryopreserved

24  hepatocytes to that customer, with no other use, that would

25  be inducing infringement.

 1    THE COURT:  Are you saying that is -- what is that,

 2    inducement?

 3    MR. SIGALE:  Inducement, your Honor, or

 4    contributory infringement.  In either event you can enjoin

 5    the defendants from selling the product.

 6    THE COURT:  Well, I will -- I want --

 7    MR. SIGALE:  And that is --

 8    THE COURT:  I will want to hear from the defendants

 9    on that score.

10    I really had not focused on Claim 10 in particular

11    as to that component, but I must say I am not -- let me put

12    it a little differently.  I was not totally convinced by the

13    two cases, but I am bound to follow them.  Okay?  And it

14    seemed to me that there is some element of illogic in -- in

15    saying that the -- that a party is home free by reason of

16    having practiced the method earlier and then being able to go

17    ahead and sell thereafter, because my suspicion is that the

18    same might well be said about what had happened in those

19    other cases.  I didn't look at them from that perspective,

20    but that is -- I will want to hear from defendants on that

21    score.

22    MR. SIGALE:  Okay.  And, your Honor, we also

23    briefed this in that supplemental briefing that we made after

24    they made this additional argument explaining the difference

25    between the contributory infringement --

1      THE COURT:  Yeah.

2      MR. SIGALE:  -- and the inducement aspect with

3  respect to Claim 10.  So I would refer the Court back there

4  to Claim 10 if you have additional considerations.

5      THE COURT:  What about -- what about the issue of a

6  bond?

7      MR. SIGALE:  Well, your Honor, we don't have any

8  proof as to what --

9      THE COURT:  I know that.

10     MR. SIGALE:  -- is actually -- but I also asked

11  Mr. Hunkeler on the stand as to what their costs were.  We

12  couldn't determine that.  We -- we know that the -- part of

13  their costs are payment to APS, Dr. Li's company.  We don't

14  know how much those payments are.  So we would submit that

15  the bond that we have in place now may in fact be more than

16  is necessary for any time period that will be in place for

17  this particular injunction.  We are prepared to go to trial

18  on an early basis, if this Court is prepared.

19     THE COURT:  Okay.  Thank you.

20     Who takes up the cudgels on behalf of defendants,

21  Mr. Peterson, you or one of the lawyers here in court?

22     MR. PETERSON:  Your Honor, with the Court's

23  indulgence I will make a -- a comment or two.  I have asked

24  the -- I had a difficult time hearing opposing counsel's

25  comments, and toward the end of your Honor's decision the

1  telephone connection was not quite as good as it was earlier.

2  But let me make these comments, and then I would request the

3  indulgence of the Court to allow counsel present in the

4  courtroom, who have also been admitted pro hac vice to add

5  sufficient detail.

6  But regarding the scope of the injunction, as your

7  Honor I think has indicated, it is very important that it not

8  include products where any step of the claim was practiced

9  prior to the issuance of the patent. With respect to how

10  that interrelates with the bond, the bond really should be

11  considered to be prospective.

12  THE COURT: Well, it is --

13  MR. PETERSON: And with regard to a product made

14  prior to the patent, there is some quantity available --

15  there was testimony during the hearing that AP Sciences, a

16  supplier of defendants, made some product prior to October

17  2009. So that product would be a product that is not -- was

18  not made using the the method of the patent as published.

19  However, the bond relates to prospective injury,

20  and with respect to that the evidence was that the sales of

21  the defendants have been running at about a million dollars a

22  year. They are very high margins, so substantial net profits

23  to the product. The bond, as originally entered for the

24  temporary restraining order, was designed to be in accord

25  with a short restraining order using the $240,000.00 per

1    quarter amount of sales as the indicator.

2           If now an injunction is entered that will last

3    through the trial and perhaps beyond, the bond -- until final

4    appeal of the case the bond should be commensurately higher,

5    which is in the order of considering a million dollars of

6    lost sales per year, as well as the injury of lost business

7    permanently and loss of the product line, should the bond

8    have been improvidently issued.

9           So we would urge that the bond be set in an amount

10   at least reflecting the million dollars per year sales and

11   the loss of future business and submit that a $2 million or

12   higher bond would be appropriate.  That is the only -- as

13   your Honor knows, the only amount against which defendants

14   are entitled to recover in the event of wrongful injunction.

15          With respect to Claim 10, the practice is -- of the

16   Claim 10 is subject to some of the same issues with respect

17   to Claim 1, that is, it requires the use of a

18   multi-cryopreserved hepatocyte preparation, which is defined

19   in the patent itself.  And so that Claim 10 would not be

20   violated with respect to an injunction that allows a product

21   made prior to the patent date to be used.

22          THE COURT:  I don't think -- I don't think that --

23          MR. PETERSON:  Furthermore, there is another issue

24   here, which is respect to foreign customers, because with

25   respect to foreign customers, there would of course be no

1    infringement whatsoever with respect to use, sale, export or
2    use outside the United States.  And so that can also be
3    carved out.

4          With that I would let either Mr. Finst or
5    Mr. Miller, who is present in the courtroom and who had a
6    better ability to hear the issues with respect to those
7    matters, add in, if your Honor so allows.

8          THE COURT:  Thank you.  One of the drawbacks of the
9    system, or lack of system, that we are operating under in
10   connection with the telephone call is that it is a one-way
11   street, that is, I cannot and could not break in at any point
12   when I found a problem with what you had stated.  And,
13   accordingly, I will have to deal with that in terms of
14   counsel who are here in court.  So let me hear from counsel.

15         MR. FINST:  Good morning, your Honor.  Let me first
16   respond to the Claim 10 point.  There is two issues.  The
17   first, you heard counsel allege that the sale of products
18   made before the patent issued would be an inducement
19   infringement or a contribution to infringement because of the
20   so-called multi-cryopreserved hepatocytes.  But in terms of
21   the scope of your order, not just in the context of Claim 10
22   but also in the context of Claim 1, there is some significant
23   claim construction issues, particularly with regard, as your
24   Honor probably knows from Claim 10, what the meaning of
25   multi-cryopreserved is.  Because the cells, the hepatocytes

1   that were made before the patent issued, are frozen.  They

2   are not twice thawed.  And as sold, they haven't been thawed

3   a second time.  And, therefore, under an appropriate

4   construction of multi-cryopreserved hepatocytes, as it is

5   defined by the specification itself, there can be no direct

6   infringement of Claim 10 or a contribution or inducement of

7   infringement of Claim 10, not just by cells made before the

8   patent issued but by cells made after the patent issued as

9   well because they aren't multi-cryopreserved hepatocytes by

10  their very nature.

11          THE COURT:  Wait just a minute.  Let me see if I

12  understand where you are going on that point.  What you are

13  suggesting, I gather, is that it is still possible for you,

14  with respect to those products, to essentially engineer

15  around the patent?  Is that your claim, because of the fact

16  that they have not been -- they have not been subject to the

17  -- what is treated as the basic, what I have referred to as a

18  roadmap, for -- for noninfringement?  Is that your argument,

19  that is, that they haven't gotten to that stage and,

20  therefore, when they get to that stage, you are going to be

21  in a position to do it, instead of without the -- without,

22  let's say, Percoll treatment to wash them, otherwise is that

23  -- with Percoll treatment and, therefore, these are not then

24  multi-cryopreserved within the meaning of the patent?  Is

25  that what you are saying?

1    MR. FINST:  This -- this is not even in the context
2    of the re-engineering that your Honor was referring to by the
3    wherein clauses.  This is back to basic concepts of claim
4    construction and the definition of multi-cryopreserved
5    hepatocyte preparation, your Honor.  And in Column 4,
6    beginning at line 18 through lines 22, there is an express
7    definition of multi-cryopreserved hepatocytes as hepatocytes
8    that have been frozen and thawed at least two times.  And the
9    hepatocytes that are -- would be used or could be used within
10   the context of Claim 10, as required, have to have been
11   thawed a second time.  And the hepatocytes that CellzDirect
12   is selling have not been thawed two times.  So there cannot
13   be, in the context of either Claim 1 or even in Claim 10 --
14        THE COURT:  All right.  Wait just a minute.
15        MR. FINST:  -- an infringement with respect --
16        THE COURT:  Wait just a minute.
17        MR. FINST:  Yes, your Honor.
18        THE COURT:  You know, I wasn't there when you
19   people were engaging in whatever your process is.  The first
20   time I have heard that the -- that what you have in hand --
21   what your client has in hand are things that have not been
22   multi-cryopreserved.  I didn't understand that at all.  I
23   didn't hear anything about that during the course of the
24   hearing.  I would have expected that if that were the case,
25   the argument would have been made on behalf of defendant.

1    You weren't bashful about making arguments.  I would have

2    expected to hear that the argument would have been what are

3    you -- go away, don't bother me; take your business elsewhere

4    because we are not involved in -- in that infringement at

5    all.  And that isn't what I heard.

6         You know, for you to be coming up with this at this

7    point really strikes me as -- as very troubling, frankly.

8    Why -- if such is the case, if what you were -- what you are

9    basically saying is that we haven't practiced the -- what is

10   charged in the -- in the complaint because we don't have

11   multi-cryopreserved product and, therefore, we haven't

12   practiced that method, why didn't I get told that then and

13   say, why are we wasting all of your time?  That is troubling.

14        Do you understand the question I am asking?

15        MR. FINST:  I understand what your Honor is saying

16   and I --

17        THE COURT:  You had -- I think you had an

18   obligation -- you had a obligation to the opposing party, you

19   had an obligation to the Court, to front that matter, because

20   basically what you are saying is, well, we weren't infringers

21   at all.  That is what you are saying.  We weren't infringers

22   under any reading.  And, come on, that isn't how I heard the

23   thing coming out in connection with what is a hard-fought

24   proceeding up to this point.  And for you to keep that in

25   your hip pocket until now is really -- you know, talk about

1   inequitable conduct.  That one really strikes me as very

2   troubling indeed.

3          I will expect to hear from plaintiff's counsel

4   because, you know, they are -- they are more the technical

5   people, obviously, than I in this field.  But that is very

6   disturbing.

7          MR. FINST:  So I disagree with your Honor's

8   statement that we have kept this in our pocket and raised it

9   for the very first time.  This argument was squarely joined

10   during the course of the proceedings and in our briefing,

11   both before the hearing and after the hearing.  And we asked

12   Dr. Strom specifically -- in fact it was plaintiff's counsel

13   who asked Dr. Strom specifically whether the claims

14   themselves required a second thaw to be infringed.  And Dr.

15   Strom said on the stand under oath that claims require a

16   second thaw to be infringing.

17          THE COURT:  That is your -- you are missing -- I am

18   sorry, you are not being responsive to my point.  I am not

19   talking about what the claims require.  What I am talking

20   about is your conduct.  That is what I am talking about when

21   I say that that is really inappropriate.  Of course, nobody

22   is arguing about the construction of the claim.  Everybody

23   knew from day one that multi-preserved means multi-preserved,

24   you know, it is a -- multi-cryopreserved, and that was never

25   an issue.

1    What you are now saying, however, is that, well,

2 our product really is -- is washed clean, to make a bad pun,

3 because of the fact that it never practiced the art that is

4 taught by the patent.  And I heard not a single word to

5 suggest that during the course of the hearing.

6    Let me -- let me see if I -- have I missed

7 something, counsel?

8    MR. SIGALE:  Your Honor, I think perhaps Mr. Finst

9 may have started the argument a little unartfully.  I think

10 what he is trying to argue with respect to Claim 10 --

11    THE COURT:  Well, don't make his argument for him.

12    MR. SIGALE:  Well, your Honor, this is --

13    THE COURT:  All right.  Tell me -- tell me your

14 thought.

15    MR. SIGALE:  -- this is an important thing, and I

16 want to make sure the Court understands and so we don't make

17 a mistake.  There is important issues at stake.

18    THE COURT:  Okay.

19    MR. SIGALE:  There is clearly going to be an appeal

20 at stake, so let's try to get it right so we are not just

21 back down here.

22    THE COURT:  Okay.

23    MR. SIGALE:  Okay?  The way I hear the argument is

24 this:  It is multi-cryopreserved.  The question is whether or

25 not CellzDirect is doing the second thaw.  And what they are

1    arguing now -- and that was one of the things that they added

2    into their post-trial brief -- is because they are not doing

3    the second thaw, they somehow avoid the claim.  I would

4    submit that that is just ridiculous.  They didn't submit any

5    evidence that any of the researchers or any of the customers

6    used the multi-cryopreserved hepatocytes frozen.

7              THE COURT:  How --

8              MR. SIGALE:  Somebody is thawing them, right?

9              THE COURT:  Somebody has got to thaw them.

10             MR. SIGALE:  So there has been no proof of any

11   infringing use.  So if this noninfringement argument is

12   somehow that people are using the multi-cryopreserved

13   hepatocytes frozen --

14             THE COURT:  As frozen.

15             MR. SIGALE:  -- it is absurd.  And that is what I

16   think I am hearing here.

17             Now, there is another aspect to the argument -- and

18   this comes back to what your Honor had said during the

19   hearing.  The question is, what does it mean in the whereas

20   clauses where it says without requiring --

21             THE COURT:  Wherein.  The wherein clause.

22             MR. SIGALE:  Wherein you are not required to do the

23   density fractionation step --

24             THE COURT:  Right.

25             MR. SIGALE:  -- after the second freezing.  They

1   are saying that you don't know if you need to do that until

2   you have done the second thaw.  That is silly.  That is the

3   point that you were making.  The not requiring it means that

4   you tell your customers you don't have to do the Percoll step

5   when you -- when you get this product.  They have been

6   selling it in this very way.  They say clean it up with CHRM.

7   They don't say clean it up with Percoll.

8           So there is no evidence that was presented at the

9   hearing to support this no second thaw argument.  That I

10  think is the problem, and that is why it is not ringing with

11  the Court now, because they didn't present any evidence that

12  any customer would ever dream of using the hepatocytes as a

13  popsicle.  It just doesn't happen.

14          THE COURT:  Well, I -- look, I am going to leave it

15  -- I am going to leave it to counsel in terms of the framing

16  of the terms of the preliminary injunction.  But I must say

17  that the -- that the arguments that you are -- that you are

18  suggesting is one that cannot carry with it, I think as a

19  logical matter, the idea that no second thaw take place.  The

20  -- for exactly the reason that was posed on behalf of Celsis

21  who operates with these cells in their frozen capacity.

22          Is that really what the -- what the -- the people

23  who are engaged in the process do?  I would be amazed at that

24  because I am not sure how that works -- of course I don't

25  know.  You know, I don't know what the -- what the scientists

1   do.  But the idea that he would be functioning with still

2   frozen cells, I am not sure what kind of experimentation can

3   go on with that, because the whole idea is to have cells in

4   viable form.  And I don't think that you can refer to the --

5   to a still frozen cell as viable in a meaning -- meaningful

6   way.  Something has got to be done to that in order to make

7   it viable for purposes of the scientific process that

8   follows, the testing and the experimentation that follows.

9   So if that is the nature of your argument, you don't get --

10  you don't get much mileage on it.

11         Has -- has counsel misstated the argument as you

12  have posed it?  You think that it doesn't fit the definition

13  because of the fact that it hasn't yet taken place, is that

14  what you are saying?  That you say, well, the definition is

15  clear from the language of the patent, just look at it, and

16  this doesn't fit because we haven't yet thawed the cells

17  after the second cryopreservation, is that your argument?

18         MR. FINST: That is at least part of the argument,

19  at least with respect to Claim --

20         THE COURT:  That one you lose.  What is the rest?

21         MR. FINST:  So, your Honor, now that I understand

22  you are going to defer to the parties to come up with the

23  scope of the order, I think we need some very clear road

24  marks in terms of claim construction and some of these claim

25  terms so that we can frame an appropriate -- or at least we

1   can try and frame an appropriate order with counsel.  And

2   there are some claim terms where we really need a

3   construction if we are going to work with the other side to

4   come up with an appropriate order.

5           THE COURT:  Well, you know, I left the practice --

6   I used to do some patent work, believe it or not, although

7   that was a sign of misspent youth, but I am not in that

8   business now.  And I am not going to be engaging in patent

9   practice by redrawing claims on an issued patent.  The patent

10  was issued in accordance with its terms.  And so what you are

11  asking me now is to engage in some kind of redefinition or

12  reframing, and I am not doing that to assist either side.  I

13  am not doing that to assist you in -- in being able to design

14  around.  You people are ingenious.  You figure out your own

15  way to design around.

16          I made the point about in four different ways that

17  by including the wherein provisions, they have essentially

18  pointed the way for anybody who does not intend to infringe

19  to avoid infringement.

20          But the -- but the idea of saying, well -- to the

21  Court, you draft one carefully so that we know exactly what

22  we have to do, that is really not my responsibility.  And so

23  the idea of saying, well, the patent is there, but don't

24  worry about that, Judge; you recast the patent.  You know, I

25  am not -- I am not in that practice and I am -- I am

1    certainly not going to do it.  The ultimate determinations on

2    that are in the Federal Circuit as to -- but nobody has

3    raised the meaning of claims to begin with.  That was not

4    part of our -- our discussion.

5        So if -- if that is the second part of the

6    argument, then that is the one -- I think I already

7    dispatched that in the comments I made at the beginning.  I

8    am not accepting that invitation to -- to essentially assist

9    by some kind of advisory opinions in terms of the -- what the

10   patent -- how the patent can be avoided.  So I am -- I am

11   leaving the drafting of the preliminary injunction in that

12   sense to counsel to prepare and tender to you and tender me.

13   And then I will hear if there is any objections.

14       But what about this -- your heard Mr. Peterson's

15   point about what you believe -- what he believes the bond

16   issue ought to be.  Is there something that -- that you

17   wanted to add to or elaborate on that before I turn to

18   plaintiff's counsel and ask them?

19       MR. FINST:  Yes, your Honor.  So I just want to

20   respond to one point that you have just made outside of the

21   bond context.  We are not asking you to reinterpret the

22   claims.  But as part of your analysis for making a

23   determination on likelihood of success on infringement, I am

24   sure you necessarily engaged in claim construction to make

25   findings of the meaning of multi-cryopreserved hepatocyte.

1    THE COURT:  No, I am not going to do that.  The

2    patent -- you know, I have criticized -- I issued a published

3    opinion a long time ago because I -- my secretary got tired

4    of typing up the same stuff in which I -- in the context of

5    pleading I criticized lawyers for saying that a document

6    speaks for itself by saying I have been listening to

7    documents for years and I have yet to hear that.

8    But I am -- it seems to me that this is one area in

9    which in asking the Court to invent a new -- a new patent for

10   one that has issued is an invitation to peril.  It is really

11   not the Court's responsibility.  And, you know, we didn't get

12   anything that even suggested, for example, that there were

13   Markman considerations that had to be looked at at this

14   stage.  I didn't hear that from either side.  And, you know,

15   absent an invitation to do that, which is something that I --

16   I normally view as the -- as the threshold issue in any

17   patent case, I didn't touch on it.  And I don't think that at

18   this point you can essentially get into that -- back into

19   that.

20   MR. FINST:  So procedural, your Honor -- and I

21   think the other side, Celsis's counsel, would agree that

22   there were disputes about the construction of many of the

23   terms that are at issue.  And now to the extent your Honor

24   doesn't make a ruling on those, that is your Honor's decision

25   or prerogative.

1    Let me -- let me address the bond because I suspect

2    your Honor wants us to move on at this point.  On the bond it

3    is going to be -- again, it is going to be very important to

4    know what particularly the scope of the preliminary

5    injunction order is to calculate an appropriate amount.  That

6    said, the preliminary calculus --

7    THE COURT:  There is nothing -- nothing to prevent

8    you people, if you want to -- if you want to avoid further

9    conflict with the plaintiff, there is nothing to prevent you

10   people from practicing the art in a way that you believe is

11   invited by the patent in terms of its narrowing of its scope.

12   And that was done at the instance of the Examiner.  And

13   essentially all you got to do at that point, if you think

14   that you have got a product that is -- that is just as good

15   practicing a different method -- be by my guest.

16   So the idea of saying, well, we insist on being

17   able to do the thing in the way that the patent marks out

18   and, therefore, that should be the measure of the bond, seems

19   to me to fall somewhat -- and more than an analogy --

20   somewhat -- very much like mitigation of damages, that is, as

21   I understand it, this patent, the way it was done, the way

22   that it was developed, the way that it was narrowed in order

23   to meet the objections of the Examiner, essentially gives

24   guidance as to how people can conduct themselves in this

25   business without practicing the patent.

1          MR. FINST:  Right.

2          THE COURT:  And if that is something that your

3   people can do, then it seems to me that the notion of saying,

4   oh, well, we are losing millions of dollars, doesn't --

5   doesn't really -- doesn't really, I think, carry a lot of

6   force to it.  I mean I haven't heard yet why it -- it is not

7   possible to -- for example, suppose that the -- that the

8   issue is one of not using, for example, a second stage, the

9   Percoll, or whatever that is, but at the second stage.  Okay?

10          So if your view is that using Percoll at the second

11   stage as well is something that can be done and, therefore,

12   is nonviolative of the patent, what does it cost your people

13   to do that and -- and then avoid -- avoid infringement, and

14   doesn't that then play a major role in this claim?  You don't

15   lose then millions and millions of dollars by reason of lost

16   sales.  You -- you incur an added cost, whatever that amount

17   may be -- and I suspect that it is not that major in terms of

18   the totality -- and go ahead and compete with Celsis and say,

19   we have got -- we got a product here that -- a method that is

20   -- that is done by a method that doesn't infringe, and buy

21   our product.  You know, I don't understand that at all.

22          MR. FINST:  Because there is a dispute --

23          THE COURT:  Let me ask plaintiff's counsel.  Have I

24   slipped a cog here or is that --

25          MR. SIGALE:  I think there is a -- maybe a

1    communication problem.  I mean necessarily, your Honor, you

2    have established some understanding of what the meaning of

3    the language in Claim 1 means.

4              THE COURT:  Well, yeah, I know that.

5              MR. SIGALE:  I think what defendants are asking for

6    is beyond the pale, which I think is what we are talking

7    about now, and that is they want you to give them specific

8    definitions for a roadmap to design around the patent, which

9    we have argued is asking for a hypothetical opinion.  The

10   Federal Circuit in a number of cases has said that it is

11   important for the Court to look at the infringing product in

12   determining what the claims mean; we shouldn't be looking at

13   these things in the abstract.  And the only product that we

14   have seen is a product that does exactly what the

15   interrogatory answers say that it does.  And so for us to

16   talk about --

17             THE COURT:  Let me focus on -- may I -- on the

18   point that I made.  You talk about product.  This is a method

19   patent.  Okay?  All right.  And, therefore, my question is,

20   if -- if it is possible for them to practice a different

21   method that does not then infringe, and they come up with a

22   product that they say is just as good, this -- just as good

23   as the Chevrolet, Ford is better, so --

24             MR. SIGALE:  Sure.

25             THE COURT:  How does that -- how do they then claim

1   zillions of dollars of damages?

2   MR. SIGALE:  Well, your Honor, that is one of the

3   points I would make on the bond, and that is they have been

4   plenty creative here in this Court.  I have every faith that

5   they will find some creative way to try and get around the

6   patent.  We will only know after they come up with their

7   creative way to get around the patent.  But the Court has

8   pointed to a number of claim terms in deciding what the

9   claims mean that has provided them, perhaps, an easier patent

10  to design around.  They may be able to accomplish it, they

11  may not, but we have no idea how they are going to implement

12  their proposed design-around for you to provide them with

13  some Don Quixote claim construction windmill that they can go

14  after.

15  THE COURT:  But I -- but I am focusing for a minute

16  on quantifying a bond, okay?

17  MR. SIGALE:  There is an initial problem that we

18  need to overcome, and that is this:  The only evidence that

19  we have regarding the gross sales is in Mr. Hunkeler's

20  declaration.  We asked CellzDirect to provide us with the

21  backup sales numbers on a month-by-month basis.  Mr. Peterson

22  promised the plaintiff that he would send us that material.

23  We never received it.  Okay?  That is number one.

24  Number two, we only have the gross number.  We

25  don't know the net.

1    THE COURT:  Right.

2    MR. SIGALE:  We are not covering their gross.  We

3    are -- a bond is meant to cover their loss in profits.  And

4    we were not provided with any cost information.  I asked

5    Mr. Hunkeler if he could describe what the costs were.  For

6    all we know, the costs of that million dollars in sales could

7    have been $950,000.00.  We just don't know.  And this Court

8    is left with no basis on which to make a determination

9    regarding the bond.  We also don't know what the trial date

10   is.  And we also don't know how quickly they can implement a

11   successful design-around.

12   Based on that there is a paucity of proof with

13   respect to the bond that needs to be put into place here.

14   And that was defendants' responsibility to do so, not ours,

15   your Honor.  Not the Court.  The Court doesn't have to make

16   up the evidence on which a bond should be placed.  If the

17   defendants want a bond, they need to put into the record the

18   evidence on which this Court can reasonably base a bond.

19   THE COURT:  Well --

20   MR. FINST:  So let me respond to that because I am

21   aware of no law which says during a preliminary injunction

22   hearing one has to provide evidence on what the appropriate

23   bond number should be with specificity.

24   THE COURT:  What, does that come out of my head?

25   MR. FINST:  That -- well -- if your Honor issues a

1    preliminary injunction, I think it is matter of efficiency if

2    the Judge -- if your Honor doesn't issue a preliminary

3    injunction, why inundate you with evidence about what the

4    particular number should be?  If your Honor does enter an

5    injunction, then revisit it and then let's look and see what

6    an appropriate figure should be.

7           Let me propose this:  Your Honor has indicated

8    parties have to meet and confer about what the scope of a

9    preliminary injunction order should look like.  I think we

10   should join with that issue what specifically the figure --

11   bond figure should be so we can prepare those numbers and

12   make a proposal to the Court.

13          THE COURT:  Well, you know, that does not reflect a

14   reading of Rule 65C.  Rule 65C says the Court may issue a

15   preliminary injunction or a temporary restraining order only

16   if the movant gives security in an amount that the Court

17   considers proper to pay the costs and damages sustained by

18   any party found to have been wrongfully enjoined or

19   restrained.  I do not understand that as meaning enter an

20   injunction now and decide at some indefinite later time.

21          What I have to do is to deal with the record as it

22   has been developed.  And I think that as the record has been

23   developed, the -- what has been said on behalf of the

24   plaintiff is -- is really an accurate reflection of what we

25   have had in place for the Court's determination as to a --

1   the amount that it considers proper.

2   Now, that doesn't mean that, for example, if there

3   is a showing made at some later point that a greater amount

4   is necessary, that you can come in and make such -- and

5   tender such a showing. And if we have to deal with it in

6   evidentiary terms, I guess we will deal with it in

7   evidentiary terms. But as far as I know, the requirement is

8   that when the Court issues the injunction order, it sets a

9   bond and it sets a bond based upon what the evidence is that

10  has been before it.

11  I am not going to hold off on the issuance of a

12  preliminary injunction while you go about doing whatever you

13  think has to be done in terms of setting up matters that

14  haven't been addressed. So at this point I think the thing

15  that should be done is for plaintiff to have the laboring oar

16  for purposes of preparing a proposed form of injunction

17  order. That does mean meet and confer because, obviously,

18  you have had the opportunity to deal with it before it gets

19  tendered to me. If the parties are differing in terms of

20  what the scope is, you will give me counter-versions. And I

21  would expect that the -- that the issues of bond is going to

22  be determined based on what we have up to this point, with

23  the understanding again that if you make a showing at some

24  later point that the -- that that is not adequate to deal

25  with the risks that you are involved in, you can make such a

1    showing.

2           But, again, I -- I give you the caveat that it

3    sounds to me as though part of that -- any -- any

4    presentation on your part, you have to be prepared to deal

5    with the point that I made, and that is that to the extent

6    that you are in a position to mitigate damages in a real

7    sense that I have talked about, you have that -- you are

8    going to have that responsibility.  So you can't just pick a

9    boxcar number and say, well, we have X million dollars in

10   sales and, therefore, that fixes the amount of the bond.  Of

11   course it does not.  It does not.  The -- you know, it is a

12   risk of loss that is involved when you are dealing with the

13   bond.  And the risk of loss is not gross, it is net.

14          So my question of you -- of both is -- or all of us

15   is, what kind of time should I contemplate for purposes of

16   getting to me proposed form or forms of order?

17          MR. SIGALE:  Your Honor, from our vantage point,

18   last time we tried to agree to an order with defendants, it

19   went no place and we had to come back to the Court.  So I am

20   concerned about this.  I would like to suggest that we set a

21   time certain, perhaps even tomorrow, because tomorrow night

22   at sundown begins the Jewish New Year.  I am gone for the

23   rest of the week after tomorrow night at sundown, and I don't

24   want to leave this sit, because I am not sure the defendants'

25   status or how they view it between now and the time that we

1  get the paper order entered.

2         So we have a prior order that we submitted to

3  defendants for purposes of the TRO.  We will go back and we

4  will put it back together for purposes of a PI.  We will get

5  it to them within a few hours maximum.  We would like to meet

6  with them this afternoon on it, figure out what it is going

7  to say and present it to the Court perhaps in open court

8  tomorrow.

9         THE COURT:  I will wait to hear from you.  And if

10  you have something to present to me tomorrow, I will review

11  it.

12         MR. SIGALE:  Can we get on calendar for tomorrow

13  then?

14         THE COURT:  Pardon?

15         MR. SIGALE:  Can we get on calendar for tomorrow

16  then, your Honor?

17         THE COURT:  Well, I have got the voir dire

18  conference in that criminal case, right, Sandy?

19         THE CLERK:  Yeah, at 1:15.

20         THE COURT:  What time is that one?

21         THE CLERK:  1:15.

22         THE COURT:  You are facing a sundown problem,

23  right, tomorrow, is that it?

24         MR. SIGALE:  Well, I don't have a criminal waiting

25  to go to jail, your Honor, but I need to get out sometime

1    around 4:00 o'clock in the afternoon to get home.

2              THE COURT:  Well --

3              MR. FINST:  So, your Honor, Scott Miller and I are

4    available for the duration of the day.  We were planning to

5    fly out this evening.  We are agreeable to sticking around --

6              THE COURT:  If you can do it --

7              MR. FINST:  -- and working with --

8              THE COURT:  If you can do it and get it to me in

9    the morning, that is fine.

10             MR. SIGALE:  All right.  Then --

11             THE COURT:  Tomorrow morning.

12             MR. FINST:  To the extent we can meet and confer

13   with counsel, and if it goes into tomorrow --

14             THE COURT:  I will say 10:00 o'clock.  If you have

15   a problem with that, get back to Sandy and let her know.

16             MR. SIGALE:  10:00 o'clock will be great, your

17   Honor.  Thank you.

18             I guess the other question for purposes of setting

19   a bond is, when does the Court think it would be available

20   for trial in this matter?

21             THE COURT:  Well, you know, look, trials in my

22   court require final pretrial order before the trial takes

23   place.  And ordinarily the way that I handle a normal case --

24   and I know this is abnormal in all respects -- the way I

25   handle a normal case is that because the plaintiff has the

1  laboring oar in generating the -- the draft of a final

2  pretrial order, I normally allow about six weeks for them to

3  take the back and forth of generating that, keeping in mind

4  that I would not require trial briefs in this one.  I never

5  do.  I would not require an identification -- I would not

6  require motions in limine to accompany the final pretrial

7  order.  To the extent that motions in limine are anticipated,

8  I would require just a brief statement as to the nature of

9  the motions, because what I always do is to set a pretrial

10  conference within a couple -- 14 days after I get the final

11  pretrial order.  I would not require -- this is going to be a

12  jury trial, bench trial, what?

13          MR. SIGALE:  That is a good question your Honor.

14          THE COURT:  Pardon?

15          MR. SIGALE:  We demanded a jury.

16          THE COURT:  Okay.  So you don't have to have jury

17  instructions and you don't have to have voir dire

18  questions --

19          MR. SIGALE:  We did demand a jury.

20          THE COURT:  -- with a final pretrial order.

21          MR. SIGALE:  So we don't need to include the voir

22  dire and the jury instructions?

23          THE COURT:  Not in the final pretrial order itself.

24          MR. SIGALE:  Okay.

25          THE COURT:  That facilitates being able to

1   generate --

2            MR. SIGALE:  Sure.

3            THE COURT:  -- the final pretrial order in shorter

4   form.

5            You do identify the prospective witnesses on a will

6   call and may call division.

7            You identify anticipated exhibits.  And under our

8   final pretrial order form no objections are entertained to

9   exhibits that are not referred to in the final pretrial

10  order.  I do not want any foundation objections.  I do not

11  want any authentication objections.  Those are seldom

12  productive.  And unless a document is bogus, in which case

13  you can, of course, refer to foundation.  But other than

14  that, I do expect to see that.

15           I don't require an identification of contested

16  issues of fact.  Agreed-upon issues of fact should be there

17  because that tends to facilitate a trial because that can be

18  delivered by way of stipulations rather than calling a

19  witness -- a live witness to deal with items that are of that

20  nature.

21           And I -- I am not sure -- usually I do not require

22  a statement as to contested issues of law.  In this instance,

23  experience of dealing with you people for a short time,

24  suggests that maybe I ought to have that so that we don't

25  find ourselves like ships that pass in the night.

1    But that is -- but to complete this, when I get the

2    final pretrial order and have the pretrial conference,

3    depending on whether there are motions in limine of any

4    significance, I -- I ask counsel to provide me with their

5    statement of unavailability, which includes unavailability of

6    witnesses, during the next couple of months so that I can

7    basically -- and also, as the order provides, an estimated

8    length of trial. And that way I can then -- depending on

9    what we get from both sides on that, we can then set a trial

10   date. So trial date is not something that gets set now. It

11   gets set once we have our pretrial conference. Okay?

12          MR. SIGALE: Can --

13          THE COURT: I think that is it.

14          MR. SIGALE: Can we set then the pretrial

15   conference date? I guess that was the appropriate question.

16          THE COURT: That is normally -- that is normally

17   about two, three working days after I get the final pretrial

18   order because that will have enabled me to take a look at it

19   and see whether I find any deficiencies or not.

20          MR. SIGALE: Okay.

21          THE COURT: So that is a function of -- of how

22   quickly you can produce that.

23          MR. SIGALE: Okay. So in terms of the final

24   pretrial order, is it on the parties to decide when we submit

25   it to your Honor then? Is that --

1          THE COURT:  Well, no.

2          MR. SIGALE:  -- acceptable?

3          THE COURT:  I just told you what my norm is.  If

4     you can beat that, by all means be my guest.

5          MR. SIGALE:  I --

6          THE COURT:  The sooner you can generate that, the

7     sooner we are likely to have trial.

8          MR. SIGALE:  Sure.

9          THE COURT:  All I am saying is that in recognition

10    of the fact that the plaintiff does the -- does the first

11    draft --

12         MR. SIGALE:  Sure.

13         THE COURT:  -- and then there is back and forth, my

14    normal pattern, normal experience, is that it takes five,

15    six weeks to get it to me.  If you can do it faster,

16    wonderful.

17         MR. SIGALE:  We haven't had discovery yet, your

18    Honor, so I am trying to figure out the parameters of the

19    case because if it is going to be about a year --

20         THE COURT:  I don't know how much discovery you

21    want.  You know, I figured you people are all ready to go to

22    bat.  You know, that is the way you sounded.  I wanted to

23    know how quickly you can do it.

24         MR. SIGALE:  Well, I am as ready to go to bat as I

25    can without having been in their facility to see how they

1  have practiced the invention directly, so --

2          THE COURT:  Obviously I am not going to set a

3  schedule until you get your discovery.

4          MR. SIGALE:  Okay.

5          MR. FINST:  With respect to the schedule, your

6  Honor, when do you hold a claim construction hearing?  Is

7  that right up against trial or is it typically in advance of

8  trial by a --

9          THE COURT:  What about the -- the Markman hearing?

10         MR. FINST:  Yes, sir.

11         THE COURT:  I try to do that at the earliest

12  possible time.  You know, the way in which you people

13  presented this thing to me -- and I am not faulting anybody,

14  but I got to tell you the impression I got was there were no

15  disputes about claim construction that -- because if there

16  had been -- if there had been, I would have expected those to

17  be tendered to me essentially in that form in conjunction

18  with the preliminary injunction hearing that we had.

19         And when I didn't get that, it -- my natural

20  assumption, I will tell you, was that this is not a case that

21  basically deals with the way I normally approach patent

22  litigation, and that is to say to the lawyers, when they

23  start talking about discovery, I want you to focus -- even

24  though I know, by the way, the new patent rules say otherwise

25  -- but I always say, no, do Markman first because it is very

1    important that we have an identical vocabulary before we go

2    forward.  I don't know why the majority of people who

3    contributed to this whole process came out the other way.  It

4    didn't seem to me to make a lot of sense.

5           But I will tell you my -- my practice has always

6    been to approach Markman issues first and -- and I -- all I

7    could tell you is my understanding really had been that --

8    that those issues were really not issues from our

9    perspective, because that isn't the way that the people on

10   either side teed up the presentation for me.  So, you know,

11   if I was mistaken on that, I don't know -- I don't know whose

12   fault that is.

13          MR. SIGALE:  I don't believe you were, your Honor.

14   We believe that the plain and ordinary meaning generally

15   controls.  Our briefs were very clear on that.

16          THE COURT:  Yeah.

17          MR. SIGALE:  Whether the defense raised claim

18   construction issues or not, I will leave it to them to state.

19          MR. FINST:  And --

20          MR. SIGALE:  So I think we know -- I am sorry, Mr.

21   --

22          MR. FINST:  Counsel.

23          MR. SIGALE:  So I think we have our marching orders

24   and we will get something to the Court hopefully tonight so

25   we can --

1          THE COURT:  All right.

2               MR. SIGALE:  -- talk with you tomorrow about it.

3          THE COURT:  Thank you.

4               MR. SIGALE:  Thank you.  Thank you, your Honor.

5       (Which were all the proceedings heard.)

6                        CERTIFICATE

7       I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   s/Rosemary Scarpelli/        Date:  September 8, 2010

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25