1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    CELSIS IN VITRO, INC.,          )   No. 10 C 4053
                                     )
4                     Plaintiff,     )   Chicago, Illinois
                                     )   September 8, 2010
5                                    )   10:00 o'clock a.m.
     -vs-                            )
6                                    )
                                     )
7    CELLZDIRECT, INC., et al.,      )
                                     )
8                     Defendants.    )

9
             TRANSCRIPT OF PROCEEDINGS - STATUS
10        BEFORE THE HONORABLE MILTON I. SHADUR

11   APPEARANCES:

12   For the Plaintiff:        LOEB & LOEB, LLP
                               321 North Clark Street
13                             Suite 2300
                               Chicago, Illinois 60606
14                             BY:  MR. JORDAN S. SIGALE
                                    MR. ADAM G. KELLY
15
     For the Defendants:       HILLIS CLARK MARTIN & PETERSON, P.S.
16                             1221 Second Avenue
                               Suite 500
17                             Seattle, Washington 98101
                               BY:  MR. MICHAEL R. SCOTT
18                                       and
                               LIFE TECHNOLOGIES CORPORATION
19                             5791 Van Allen Way
                               Carlsbad, California 92008
20                             BY:  MR. RIP FINST

21

22

23   Court Reporter:          ROSEMARY SCARPELLI
                              219 South Dearborn Street
24                            Room 1412
                              Chicago, Illinois  60604
25                            (312) 435-5815

1    THE COURT:  This is 10 C 4053, Celsis In Vitro

2    versus CellzDirect.

3    THE COURT:  Counsel on the phone, please identify

4    yourself for the record, please.  And then counsel here in

5    court will do the same.

6    MR. SCOTT:  Good morning, your Honor Judge Shadur,

7    this is Mike Scott in Seattle for defendants.

8    MR. SIGALE:  Good morning, your Honor, Jordan

9    Sigale and Adam Kelly for the plaintiff Celsis In Vitro.

10    MR. FINST:  And Rip Finst and Scott Miller for the

11    defendants also, your Honor.

12    THE COURT:  Good morning.  I was just delivered and

13    I gather that the plaintiff's counsel also just received

14    under seal a second supplemental declaration by Mr. Hunkeler

15    in which he seeks to quantify the potential loss to the -- to

16    defendant that would serve as a measure for the bond in

17    connection with the issuance of preliminary injunction.

18    Now, you may well regard this as a demonstration of

19    my ignorance, despite all of your efforts to educate me in

20    this field, but what -- what I am -- what struck me

21    particularly by the analysis here at first look was that it

22    talks about what would be involved in preventing LTC, Life

23    Technological -- Technologies Corporation, rather, from

24    selling pooled cryopreserved human hepatocytes.  Now, the

25    things that I mentioned yesterday, the idea of mitigation of

1   damages that I thought had put the parties at least on alert

2   as to what struck me as the -- as a component that had to be

3   kept in mind in terms of defining this potential loss

4   because the thing that is sought to be enjoined here is the

5   use of a method, not the production of a product.

6            And I thought that what that meant was that one of

7   the elements that had to be considered in that respect was

8   what would it cost LTC or CellzDirect to convert to the

9   potential for a method that would not be an infringing method

10  and would result in the production or could result in the

11  production of a product, so that basically the marketing is

12  they are not knocked out of the market entirely.

13           Let me just ask as a preliminary, did I not make

14  that clear yesterday as I had hoped to?  I suppose I -- let

15  me first ask plaintiffs who have a different stake, was that

16  not your understanding of what I was talking about in part?

17           MR. SIGALE:   That was my understanding, your Honor.

18  And in part I am disappointed by this declaration of

19  Mr. Hunkeler for a number of reasons.

20           THE COURT:   Well, I am not asking you to go into

21  the whole thing.

22           MR. SIGALE:   Well --

23           THE COURT:   That is one important component, but it

24  ignores entirely the prospect that somebody in the

25  competitive position, as they are, and wanting to hit the

1    market and be competitive in terms of customers who are

2    interested in a product, the customers are not that

3    interested in the method because they get the result of the

4    use of the method, they don't get the method itself.  And as

5    a result, the customers -- and that is what we are talking

6    about here, the customers are interested in getting the

7    cryopreserved human hepatocytes.  And I -- and to ignore

8    that, which is what Mr. Hunkeler's approach has done here,

9    seems to me to miss a very significant part.

10          You know, what we are talking about -- I used the

11   term, I think, "engineering around" yesterday.  That may be

12   inartful when we are talking about this kind of process.  But

13   everybody knows what I mean when I -- when I say that, that

14   is, it is a matter of reflecting the kind of ingenuity that

15   is needed in order to say, well, okay, we have got this

16   patent and now the patent is our enemy and we want to get

17   around the patent in a legitimate way, and the way to do it

18   in a legimate way is to pursue a different method that can

19   produce a product.

20          So you tell me about that.

21          MR. FINST:  Yeah, yesterday -- your Honor, may I

22   respond to that.  When we tried to meet and confer with the

23   plaintiffs yesterday about the scope of the order, it became

24   very clear to us that the plaintiffs have a much different

25   view about Claim 10 than I think your Honor and the

1    defendants have.   Claim 10, as your Honor recalls, is the
2    method for using hepatocytes in in vitro metabolism assay.
3    And --
4              THE COURT:   Wait just a minute.
5              MR. FINST:   Yes, your Honor.
6              THE COURT:   And in saying that, you are taking full
7    account of two wherein limitations in Claim 10, that is when
8    you say they have a different and broader perspective than
9    you people have --
10             MR. FINST:   Yes, your Honor, but more particularly
11   the defendants have a view that the hepatocytes that are used
12   in Claim 10 can be made by a process that does not require a
13   density gradient step between the first thaw and the second
14   freeze.   Your Honor can probably contrast that with Claim 1
15   which explicitly requires a density gradient fractionation
16   between the first thaw and the second freeze.   And your Honor
17   has asked us, at least yesterday had suggested, that there
18   was the ability to mitigate damages by designing around the
19   process that is claimed -- the process that is claimed in
20   Claim 10 is fundamentally different than Claim 1.
21             And the defendants during yesterday's meet and
22   consider and in the proposed order that we received are
23   seeking an injunction against the sale of multi-cryopreserved
24   hepatocyte products, regardless of the method by which they
25   are manufactured.   So there is effectively no ability to

1    mitigate damages if the proposed order, as drafted by the

2    plaintiffs, is entered, which would effectively foreclose the

3    selling for sale of all hepatocyte products.

4         THE COURT:  Let me say something simplistic, okay?

5    Suppose that the -- that your people engage in plating

6    between the first and second cryopreservations.  Does that in

7    -- you know, I am not going to -- I am not ultimately reading

8    these -- reading these patents in terms of validity, scope --

9    maybe I have missed what happened at the -- at the Examiner's

10   stage when they had to insert the two wherein clauses.  Maybe

11   I would ask plaintiff's counsel about that.

12        MR. SIGALE:  Your Honor, it does ignore the two

13   wherein clauses, and I -- I think that Mr. Finst is

14   misrepresenting what we are talking about here.  Claim 10

15   talks about investigating metabolism using

16   multi-cryopreserved hepatocytes wherein the -- there is a

17   viability of greater than 70 percent and there is no density

18   gradient step required after thawing to achieve that

19   70 percent viability and there is no plating between the

20   first and second cryopreservations.  Where you got that, you

21   know the guidepost you need to have to design around.

22        And the proof at trial was that the process that

23   LTC and APS are using to produced their multi-cryopreserved

24   hepatocytes results in this very type of preparation.  In

25   part --

1          THE COURT:  That is what I understood.  And so --

2   and that comes back to the point that I am making.  I don't

3   understand why the point that I have made doesn't apply as

4   contrasted with what Mr. Hunkeler has done, which is to say,

5   well, if we are prevented from doing it this way, that is, in

6   -- and essentially aping the Celsis thing, then here is what

7   our projected losses are:  But it ignores what I thought was

8   a viable -- again a bad pun, of course -- alternative for

9   that, and that is to devise a way in which you could generate

10  essentially the product that would be a competitive product

11  or a product that could be readily marketed without stubbing

12  your toes up against the -- the patent as such.

13          Again, I -- maybe I have been unduly simplistic on

14  that, but I thought that that is -- that that was -- I

15  thought from the beginning that that is something that they

16  have been essentially compelled to point the way in order to

17  get their patent allow -- their claims allowed.  And they

18  pointed a way.  And -- and what Mr. Hunkeler's declaration

19  does is to ignore that, I think, because I -- I don't -- I

20  hesitate to make analogies because analogies are often

21  treacherous.

22          But, you know, if there is another route that can

23  be taken to the same destination and the -- then a

24  demonstration of what it costs to pursue that route would be

25  a reasonable measure, perhaps, of -- of the kind of losses

1     that are involved because they wouldn't have to pursue the

2     other route if the patent were invalid.  But they would have

3     to pursue the route if you have the patent valid.

4              And that is what we are looking at.  That is what

5     we talk about when we talk about harms.  The harm that is

6     created, if I grant the preliminary injunction wrongfully, is

7     that they have been compelled to undergo whatever is -- it

8     takes in order to -- again using the term  -- engineer

9     around.  And that is ignored totally in his declaration.  You

10    can't -- you can't just pony up and say, if we are restrained

11    in all respects, and here is where our projected losses are

12    because that is not a fair measure.  That is why I referred

13    to it essentially as the equivalent in -- in the most -- more

14    conventional cases of mitigating your damages.  That is what

15    mitigation is.  Mitigation consists of what you do in order

16    to spare yourself the larger losses that would be sustained.

17             And he is silent about that.  I can't -- you know,

18    if he hasn't even approached it, how can I credit this?

19             MR. FINST:  So two responses, your Honor.  The

20    first is I think Mr. Hunkeler's declaration certainly

21    highlights that there is going to be a significant economical

22    loss to the company, even during the course of a potential

23    redesign, as your Honor suggested the company engage.

24             THE COURT:  Yeah, but he hasn't talked about that.

25    He hasn't quantified that.  He is really just saying, here is

1    -- you know, here is the big ballpark and -- and use that as

2    the measure.  And he hasn't really addressed what I think of

3    of as a major, if not the major, issue in terms of what the

4    potential loss is, the potential harm to the party enjoined,

5    if it turns out that the injunction is wrongfully issued.  So

6    I can't -- I can't accept this as the vehicle for defining

7    what the bond should be.

8            It seems to me that -- that what I suggested

9    earlier may well be the appropriate approach, that is, fix

10   the bond at a -- at -- at an amount that is maybe reasonably

11   justified at this point and if, therefore, you -- you define

12   the thing more precisely because you attack the thing the

13   right way, maybe then you can come in -- I haven't -- frankly

14   haven't looked at whether it is possible essentially to

15   enlarge the bond if there is -- but I would think that it is

16   likely that that can be done.

17           But certainly this isn't the route that -- that

18   provides me with the input that is needed for purposes of

19   granting preliminary injunctive relief now and imposing the

20   -- anything even remotely close to the figures that he has

21   talked about.  If it is correct that preliminary injunctive

22   relief is appropriate, then the idea of saying, well, hold

23   off until he is -- until you are able to develop the numbers

24   is really not fair.  It just isn't fair.

25           And what I am suggesting is something that I think

1    would be fair, and that is to provide the preliminary

2    injunctive relief now.  And if then your people are capable

3    of coming up with a sharpened pencil, or whatever the

4    computer equivalent of sharpening a pencil is, at a later

5    point, then take a fresh look at the amount of the bond.

6              Yes?

7              MR. SIGALE:  Your Honor, when we haven't seen

8    evidence yesterday -- and we did request it following court

9    -- with respect to how we could determine a bond, we did

10   research this morning that verifies your Honor's assumption

11   -- or educated guess that you can modify the bond after the

12   entry of the injunction based on additional evidence.  And we

13   are prepared to deal with that.

14             THE COURT:  Sure.

15             MR. SIGALE:  I would point out to the Court that we

16   have already lodged $70,000.00 in cash with the Clerk.

17             THE COURT:  I know that.

18             MR. SIGALE:  I would also point out that during the

19   hearing the only evidence we have about the amount of time it

20   took to develop the methodology --

21             THE COURT:  Was a day.

22             MR. SIGALE:  -- was a day.

23             THE COURT:  So maybe Dr. Li can -- maybe Dr. Li can

24   pull the proverbial rabbits hepatocyte out of the hat.

25             MR. SIGALE:  Perhaps he could.

1          The other thing that is troubling for me, your

2    Honor, is there is also evidence that microsomes are not

3    infringing.  We have never claimed that microsomes are

4    infringing.  And microsomes are pooled products.  There is no

5    reason why LTC couldn't re-task the hepatocytes by turning

6    them into microsomes and recover part of its losses that way.

7          THE COURT:  Well --

8          MR. SIGALE:  And mostly, your Honor, this

9    injunction is only for the United States, and Mr. Hunkeler's

10   declaration talks about worldwide sales.

11         THE COURT:  Worldwide.

12         MR. SIGALE:  And I have no idea how these sales

13   divide out at all.  I have no idea what portion of the

14   sales -- in terms of enjoining Claim 10, the practice of

15   Claim 10 can only be enjoined in the United States.  And I

16   will confess that what we offered to defendants was imprecise

17   in that it didn't limit the injunctive relief to use of Claim

18   10 in the United States.  So to the extent they want to sell

19   to a foreign body that is going to practice Claim 10 outside

20   of the United States, there is no reach of this Court --

21         THE COURT:  Okay.

22         MR. SIGALE:  -- in that regard.

23         THE COURT:  Well, I am ready.

24         MR. FINST:  Your Honor, if I can make -- if I can

25   have just two responses.

1    THE COURT:  Yeah.

2    MR. FINST:  The first one is with respect to the

3    bond.  Mr. Hunkeler has a Paragraph 6 in his declaration

4    where he identifies with specificity the cost of restarting

5    sales and marketing in the United States if, in fact, we are

6    able to achieve the design-around, as your Honor would

7    characterize it.  So if three months or six months from now,

8    having been excluded from the market and having, perhaps

9    successfully, obtained a design-around that is noninfringing,

10   Mr. Hunkeler has some very precise numbers about what the

11   cost would be to the company for having to re -- effectively

12   restart and re-penetrate the market in a short period of

13   time.  So at a minimum those additional costs associated with

14   restarting our sales and marking program should be included

15   in a bond amount.

16   The second point, your Honor, is with respect to

17   mitigation.  You have suggested that the claim provides some

18   level of metes and bounds on the scope of what the redesign

19   could look like or what direction a redesign program could go

20   in, perhaps.  Your Honor pointed out, for example, the no-

21   plating imitation.  There -- we attempted yesterday -- I

22   attempted yesterday with Mr. Kelly to try and identify with

23   some precision what the metes and bounds of the injunctive

24   relief would look like with respect to particular claim

25   terms, so that we would have in writing in black and white

1  knowing what specifically the activity is that Life

2  Technologies could engage in with respect to a design-around.

3  I asked Mr. Kelly specifically --

4             THE COURT:  Well, you are --

5             MR. FINST:  -- about a claim limitation.

6             THE COURT:  You are back-dooring something that I

7  have rejected.  I am not about in this order to essentially

8  redefine what is covered in the patent.  I have -- you know,

9  that is really -- it is not a reasonable request.  It is not

10  really the Court's function.  That is not what we are looking

11  at.  I am not -- I am not in the business of telling you

12  people how to conduct your business.  What I am seeking to do

13  is simply to design, as best can be done, on the basis

14  currently what is a reasonable bond.  And it seems to me that

15  the approach that I have suggested is one that I think

16  confirms that.  And to the extent that plaintiffs have --

17  they say developed authority, I would be glad to have a

18  supplemental submission.  All you got to do is cite whatever

19  cases you think.  And if defendants had other cases, they can

20  cite them as well.

21             MR. SIGALE:  With respect to reestablishing a bond

22  based on the additional evidence --

23             THE COURT:  Right.

24             MR. SIGALE:  -- your Honor, we will submit a case.

25             THE COURT:  Okay.  So now --

1        MR. SIGALE:  May -- do I need --

2        THE COURT:  When do I get the order?

3        MR. SIGALE:  We have got a proposed order that we

4   provided to defendants yesterday.  They rejected it for the

5   reasons that Mr. Finst had just mentioned.  And as I just

6   told the Court, I, in looking over it this morning, found an

7   error that we have limited Claim 10's practice to the United

8   States.  If the Court would like, I will hand up my revised

9   copy --

10        THE COURT:  Sure.  Let me take a look.

11        MR. SIGALE:  -- which the defendants received

12   yesterday.

13        THE CLERK:  Thank you.

14        MR. SIGALE:  Minus the language that I just added

15   which would add in here for use in the United States.  Right

16   here.

17        MR. FINST:  Your Honor, one concern that I

18   expressed to --

19        THE COURT:  Wait just a minute.

20        MR. FINST:  Yes, your Honor.

21        THE COURT:  Let me ask a purely technical question.

22   Is Invitrogen Corporation still the existing corporation and

23   is that the correct name, that is, is Life Technologies a dba

24   kind of situation or is it -- or has the corporate name been

25   changed, or what?

1    MR. FINST:  Life Technologies is the current

2    standing live company.  Life Technologies was formed by the

3    merger a couple years ago of Invitrogen and another

4    corporation.  So Invitrogen doesn't exist as -- as sort of an

5    extant entity, as your Honor would suggest.  Life

6    Technologies would be the --

7    THE COURT:  Then it seems to me that order has to

8    read in terms of the actual entity rather than Invitrogen.

9    Now, I recognize that most state laws, most corporate laws,

10   permit actions to proceed against dissolved or merged

11   corporations and presume -- and every merger that I ever

12   handled had a -- had a preservation of actions against the

13   companies merged out of existence.  But it seems to me that

14   probably the way to do that is to use, on counsel's

15   representation, Life Technologies Corporation, the survivor

16   of the merger, that encompassed Invitrogen.  That way you

17   don't have to change the caption of the case, but you are --

18   you are entering into an order that operates against the now

19   existent corporation.  Okay?

20   All right.  Wait just a minute.

21   MR. SIGALE:  Will do, your Honor.

22   THE COURT:  You would alter the last paragraph by

23   providing that the -- that this is the current amount of the

24   bond and it is without prejudice to a potential resubmission

25   by defendants establishing a different -- well, let's see,

1  resubmission -- make it resubmission by defendants as to the

2  appropriate amount of the bond going forward.  So you will

3  have something that already reflects the possibility that

4  defendants can come in at a later point with a showing.  But

5  other than that, it seems to me that this is in order.

6         MR. FINST:  Okay.  If I may, your Honor, address a

7  couple of things.

8         THE COURT:  Yes.

9         MR. FINST:  First, in your Honor's temporary

10  restraining order there was a carve-out with respect to sales

11  to customers who had placed orders before July 7th, 2010.

12  Perhaps you remember that.

13         THE COURT:  Yeah.

14         MR. FINST:  That the goal was to fill orders for

15  customers --

16         THE COURT:  Right.

17         MR. FINST:  -- before the TRO had entered.  The

18  current order doesn't reflect a permission on one way or the

19  other whether those sales can continue to be filled

20  consistent with the TRO.

21         THE COURT:  Did we have any kind of showing on

22  that?

23         MR. SIGALE:  No, your Honor, we agreed to that.

24  Here is my problem, and it is a problem with Mr. Hunkeler's

25  declaration this morning:  That was two months ago.  If the

1    defendants can't fill an order that was placed more than two

2    months ago, I wonder why we need a bond at all.

3              THE COURT:  Well, let it be as of that point

4    because it is quite right that because that -- from that

5    point forward I think you were proceeding at your risk, that

6    is, the defendants were proceeding at their risk in the sense

7    that they could not then harvest some other order.  So it's

8    orders that had been in place at the time we discussed the

9    issue.

10             MR. SIGALE:  Your Honor, how long is that going to

11   continue on for?  Because they have made no proof as to what

12   orders were in place prior to July 7th.  And I have real

13   concern.  Today is September 8th.  I had to look at my watch

14   and into my Blackberry to confirm it.  We are talking two

15   months now, more than two months, that these orders have been

16   in defendants' possession and they have been unable to fill

17   them.  What does that say about a bond going forward?  What

18   kind of damages could they have if over two months they have

19   been unable to fill orders that they have had?  They have the

20   inventory, presumably.

21             THE COURT:  No, he is talking about filling the

22   orders.  He is not talking about the bond.

23             MR. SIGALE:  What -- what I don't --

24             THE COURT:  He is talking about filling preexisting

25   orders, right?

1    MR. FINST:  Correct, your Honor.  As Mr. -- you

2    probably recall, Mr. Hunkeler testified that there are

3    customers that have placed orders before July 7th where the

4    hepatocytes are provided to the customer in waves on demand.

5    And in the TRO --

6    THE COURT:  Wait just a minute.  No, no, no.  I

7    heard, for example, that people customary reorder and they

8    place orders for delivery at some indefinite time in the

9    future.  That is not what we were talking about.  What I

10   understood was that you were talking about filling orders for

11   current delivery.  Current delivery.

12   MR. FINST:  For orders received before July 7.

13   THE COURT:  Because, you know, otherwise -- here:

14   It is very common -- I don't know if this is common in this

15   area, but it is very common in business to have a

16   requirements agreement.  Requirements say, you know, and

17   therefore the individual orders simply carry out the

18   provisions of the requirements agreement.  That gives

19   essentially a blank check for the future, if that were to be

20   carved out.

21   What was intended to be carved out was that -- as I

22   understood the representation that there were orders in hand

23   calling for current delivery.  And I was saying, no, they are

24   not -- they are free to go ahead and fill those orders that

25   call for current delivery.  So you want to put in language to

1  cover that, that is fine.  But that was as to that point, not

2  subsequent to that.

3  　　　　　MR. SIGALE:  And, your Honor, it was something that

4  you asked the plaintiff to agree to, and we readily agreed to

5  it under the circumstances of the TRO.  Here we are two

6  months later.  Whatever orders haven't been filled --

7  　　　　　THE COURT:  Well, I don't know what their story is,

8  but they ought to -- certainly they ought to provide you with

9  some kind of showing about that because the understanding, to

10  me at least, was clear what we were talking about, was if

11  they had orders in place and they were -- they were in the

12  process of -- of doing whatever had to be done to fill those,

13  we were not going to prevent that from taking place.  And

14  that is the extent of it.  But it relates back to that point.

15  It did not relate to obtaining orders further than that.

16  　　　　　And it also did not obtain with respect to a

17  general filling of -- of orders of an amorphous nature, you

18  know, one that says we are going to have so many units,

19  whatever it is, at some point in the future.  That is really

20  not what we were talking about.  We were talking about your

21  people not being disabled -- not losing essentially viable

22  product that you had that -- to fill current orders

23  currently.

24  　　　　　So you work out the language on that.  But you also

25  have an obligation, I think, to advise -- to give the

1  plaintiffs the information, the evidence, as to what those

2  consist of so it is not just an open-ended undertaking.

3       MR. SIGALE:  Your Honor, it seems to me that this

4  is another potential for delay in the injunction.

5       THE COURT:  No, it -- no, I am not going to delay

6  it.  I am just going to -- if -- the thing to do then is we

7  will enter the injunction order in this form.  And if it

8  needs to be amended to provide for that, we will amend it.

9  But I -- but it is with the understanding I am not -- I am

10  not now backing away from what I had said, it simply hadn't

11  been defined adequately, I think.  So you will work at that.

12       MR. SIGALE:  Thank you, your Honor.

13       MR. FINST:  One other matter with respect to

14  preliminary injunction order.  Your temporary restraining

15  order also allowed Life Technologies to continue to use

16  catalogs, albeit not fill orders of hepatocytes that are

17  listed --

18       THE COURT:  So you got catalogs that are

19  circulating, basically, is that it, that these things are

20  included in catalogs, in outstanding catalogs?  And what is

21  your client's normal practice in terms of updating of

22  catalogs and so on?

23       MR. FINST:  I have to look into that specifically,

24  your Honor, to know whether it is -- I don't think what we

25  can do is recall catalogs from all of our customers.

1    THE COURT:  I am not asking to reprint or recall

2    catalogs.  You can't fill the orders.

3    MR. SIGALE:  Your Honor, I don't believe we are

4    asking for them to recall catalogs.  I think what we -- they

5    are talking about catalogs that are currently in their

6    inventory that they would like to distribute in the future

7    that includes mult-cryopreserved hepatocyte products that are

8    infringing.  That is an offer for sale.  And if it hasn't --

9    it --

10    THE COURT:  That you ought to -- you ought not to

11    circulate anew matters that have not already been covered.

12    And it shouldn't take much time, I would think.  I don't know

13    how you store these things or what kind of quantities they

14    are ordered in.  But it seems to me that is something that

15    you have to adapt yourself to the order on.  And that

16    shouldn't be a big job.  I think that is a printing job.

17    MR. SIGALE:  What adaptation?

18    THE COURT:  I am talking about the defendant.

19    MR. SIGALE:  The defendant?

20    THE COURT:  Yeah.

21    MR. SIGALE:  Because we are not -- and I will make

22    it clear -- and we can put it in the injunctive relief order

23    -- they don't have to recall the catalogs that have already

24    been distributed.

25    THE COURT:  Right.

1    MR. SIGALE:  But with respect to distributing

2  further catalogs, that is problematic.

3    THE COURT:  Yeah, I haven't had any showing of what

4  it takes to -- of -- typically in situations such as this or

5  -- or interests of intellectual property, what happens is

6  that -- that somebody is not ordered to destroy everything,

7  but, on the other hand, you can't just continue to circulate.

8  And that is what I think is being talked about here.  So you

9  ought to find out -- to the extent it is a reprint job, they

10  can readily just reprint.  They just pull those pages out of

11  a catalog.

12    MR. SIGALE:  And they include that in the request

13  for the additional bond.

14    THE COURT:  So you get this to me later on?

15    MR. SIGALE:  As soon as we can this morning, your

16  Honor.

17    THE COURT:  Thank you.

18    MR. SIGALE:  Thank you.

19    THE COURT:  Here, take this back.

20    MR. SIGALE:  Thank you, your Honor.

21    (Brief pause.)

22    MR. FINST:  Your Honor, if I may reopen the

23  proceedings.

24    THE COURT:  I am sorry?

25    MR. FINST:  If I may -- are the proceedings still

1    open, your Honor?  My co-counsel just alerted me to something

2    I would like to address with you, if you have a couple more

3    minutes.

4                    THE COURT:  Okay.

5                    MR. FINST:  If the proceeding is closed, we will

6    move on.

7                    THE CLERK:  Counsel is not on the line anymore.  I

8    don't know if you want him on the line.

9                    MR. FINST:  Okay.  So one of the -- I think we

10   heard this morning Mr. Sigale said that Celsis is not looking

11   to prevent Life Technologies from making product in the

12   United States and exporting it for sale.  The concern about

13   the catalog issue is with respect to product that is being

14   made that would be made in the United States and exported for

15   overseas sale.  The catalogs would also be distributed to our

16   overseas customers.

17                   THE COURT:  Wait a minute.  The thing that is

18   practiced is the method.  It is not the product.  It is the

19   method.  And maybe I misunderstood that.

20                   MR. SIGALE:  I am not sure where I was unclear.

21   Defendants have made an argument they produced product prior

22   to the issuance of the patent on October 20th, 2009.  To the

23   extent that product exists, you guys can sell it outside the

24   United States because it wouldn't violate Claim 10.  To the

25   extent it was made before the patent issues, Monsanto tells

1   us it doesn't infringe Claim 1.  That is the point.

2              MR. FINST:  Just to be clear, to the extent the

3   product is made tomorrow in the North Carolina facility, is

4   exported for sale overseas --

5              MR. SIGALE:  It infringes Claim 1.

6              MR. FINST:  Why?

7              MR. SIGALE:  Because you are practicing the method

8   of Claim 1.

9              MR. FINST:  So it is, your Honor --

10             THE COURT:  It is the method -- that is what I am

11  saying, it is method and not product.  I don't understand.

12  Usually what I have are patent lawyers who are telling me,

13  Judge, look at the method, look at the method, that is what

14  this patent covers.

15             MR. SIGALE:  There is two methods, your Honor.

16  There is method Claim 1 and method of Claim 10.

17             THE COURT:  Right.

18             MR. SIGALE:  The method of multi-cryopreserved

19  hepatocyte products that came into being on October 20th,

20  2009.  Defendants have made an argument here that if they

21  produce something on October 19, 2009, that it won't infringe

22  Claim 1.  Under Monsanto, which is currently the prevailing

23  law, I am forced to agree with them.  I, frankly, disagree

24  with the precedent, would like an opportunity to challenge it

25  here, but neither here nor there.

1    With respect to product made on October 19th, if

2    you go to sell it on October 21st, 2009, for use in doing

3    metabolism testing, it -- the person doing the metabolism

4    testing, if they are in the United States, infringes Claim 10

5    of the '929 patent.

6    MR. FINST:  I understand your position with

7    respect --

8    MR. SIGALE:  So you would be inducing their

9    infringement of Claim 10.

10   MR. FINST:  I understand what you are saying with

11   respect to Claim 10.  The issue -- issue with Claim 1, the

12   parties have fundamental disagreement whether the product

13   that Life Technologies sells, which is frozen pooled human

14   hepatocytes product, that is made by method Claim 1 -- Claim

15   1 by it's very nature requires the hepatocytes that are

16   made --

17   THE COURT:  Wait a minute.  Are you revisiting

18   something that I dealt with, I thought, extensively in my --

19   in my comments?  Are we arguing the thing?  That is -- that

20   is not an open issue --

21   MR. MILLER:  Your Honor --

22   THE COURT:  -- a noninfringement.

23   MR. MILLER:  Your Honor, I think the point that we

24   are trying to make is the multi-cryopreserved hepatocytes

25   that are described that are the product of the method require

1    that the product be thawed.  And plaintiff has argued that

2    our sale in the United States of the frozen product would

3    infringe Claim 10 by inducement because the user of that

4    would thaw the cells.  And our question is, if we make -- if

5    we use the process to result in a frozen product that is --

6    that has not been thawed twice, if we can export that because

7    we have not practiced the complete method.  That is the

8    question that we have.

9          The claim is directed to a method of preparing a

10   multi-cryopreserved hepatocyte preparation and that

11   preparation is defined as being a thawed product.

12         THE COURT:  That is what you started out by talking

13   about yesterday.

14         MR. MILLER:  And we do not sell a thawed product.

15         THE COURT:  And I didn't buy it then.

16         MR. SIGALE:  Do you want me to address it, your

17   Honor?

18         THE COURT:  Yeah, go ahead.

19         MR. SIGALE:  Claim 1 says it is capable of being

20   frozen and thawed at least two times.  It doesn't say --

21         MR. MILLER:  It is method of preparing -- a method

22   of preparing a multi-cryopreserved hepatocyte.  These are

23   defined as specific as being twice frozen and twice thawed.

24         THE COURT:  That is what you started out arguing

25   yesterday.  I didn't buy it then and I am not buying it now.

1   I think that I covered quite specifically the fact that what
2   we were dealing with -- because you were arguing
3   noninfringement on that ground, and I -- I didn't accept that
4   notion.  And you are asking that it be revisited today.  On
5   what basis is --
6           MR. MILLER:  On the basis we are still trying to
7   determine the scope of preliminary injunction, and it was our
8   understanding that the scope should be directed to the method
9   that is claimed.
10          THE COURT:  The scope directed claims.
11          MR. MILLER:  That's correct.  And the claim --
12          THE COURT:  That is what you are -- and you read
13  the claims, and if you want to -- if you want to run the risk
14  of contempt for violation of an order, that is your client's
15  privilege.  But contempt carries with it cost.
16          MR. MILLER:  We --
17          THE COURT:  And I don't know how to make it more
18  plain than that.
19          MR. MILLER:  We --
20          THE COURT:  You have continued to reargue things
21  that have been argued once, have been dealt with, and there
22  comes an end.  And I don't know how to make it more plain.
23          So you get me the order.
24          MR. SIGALE:  Thank you, your Honor.  Is Court in
25  recess?

1          THE COURT:  We are in recess.

2          MR. FINST:  Thank you, your Honor.

3          MR. MILLER:  Thank you.

4      (Which were all the proceedings heard.)

5                    CERTIFICATE

6      I certify that the foregoing is a correct transcript

7  from the record of proceedings in the above-entitled matter.

8

9  s/Rosemary Scarpelli/          Date:  September 8, 2010

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25