IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CELSIS IN VITRO, INC.**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 4053 |
| | ) | |
| **CELLZDIRECT, INC.**, a Delaware | ) | |
| Corporation and wholly-owned subsidiary | ) | |
| of **INVITROGEN CORPORATION**; | ) | |
| and **INVITROGEN CORPORATION**, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

This memorandum opinion and order begins with a mea culpa on the part of this Court. Because of the overwhelming paper blizzard[2] represented by LTC's motion for partial summary judgment on three discrete issues -- or more accurately, by Celsis' responses to that motion (which, as it turned out on analysis, proved largely to be an effort to do what John Milton's <u>Paradise Lost</u> described as "make the worse appear the better reason")[3] -- and because the subjects could not lend themselves to the normal process of assigning the initial preparation and generation of a draft opinion to one of this Court's excellent law clerks, the project repeatedly

---

[1] For convenience this opinion will refer to plaintiff simply as "Celsis" and to defendants collectively as "LTC," treated as a singular noun.

[2] Lest this metaphor seem suspect, the litigants' lengthy submissions on the three issues now before this Court have added up to nearly 10 inches in thickness.

[3] Almost a millennium and a half earlier, Diogenes had turned the identical phrase in his <u>Socrates</u>, speaking there of Socrates as having been ridiculed in Aristophanes' comedies.

found itself moved aside while this Court was fully occupied with other responsibilities on its calendar.

But a block of time has opened up on the calendar as the result of a long-scheduled criminal trial having unexpectedly eventuated in a change of plea. Hence this Court has sought to take advantage of that hiatus to address the three-headed motion. And as will be seen, the presentation (though not the thought process involved) can be made in comparatively short compass.

## **Noninfringement**

Celsis, having already lost on the issue both before this Court (see its March 24, 2011 memorandum opinion and order, 2011 WL 11564931) and before the Court of Appeals for the Federal Circuit in its October 21, 2011 per curiam opinion affirming this Court, again attempts to bring LTC's elutriation process under the rubric of the Celsis patent by once more advancing its own rejected reading of its patent's language and scope. This Court sees no reason to reconsider what it held in its opinion, which was issued after a three-day evidentiary hearing that denied Celsis' second request for injunctive relief. And because the Federal Circuit's per curiam opinion is unpublished, this opinion will quote the Federal Circuit's determination at length:

> After full *de novo* review of the record, the parties' briefs, and counsels' arguments, and for the reasons articulated in the district court's decision, we agree with, and thus adopt, the district court's construction of "density gradient fractionation" and "without requiring a density gradient fractionation step after thawing the hepatocytes for a second time."[2] In light of these claim constructions, the district court did not abuse its discretion in concluding that a showing of literal infringement is not likely. As it relates to the doctrine of equivalents, although the district court referred to the differences in LTC'S new method as the "function," rather than the "way," this minor misidentification does not alter the analysis. When read in its entirety, the district court's decision as to Celsis' likelihood of success under the doctrine of equivalents is clear in its conclusion that the *way* in which LTC's new method functions (using a buffer, fluid counterflow force, and centrifugal force) is substantially different from the *way* in

which the claimed "density gradient fractionation" functions (using a density gradient medium and centrifugation alone), a conclusion with which we agree based on the record before the court at the preliminary injunction stage.

---

> [2] We find that the district court carefully considered the language of the claims, the specification and prosecution history, and the testimony of the parties' witnesses in reaching its conclusions regarding the proper construction of the claims and, thus, remained true to our guidance in *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1313-19 (Fed. Cir. 2005) (en banc).

As that quotation reflects, this Court's determination -- later buttressed firmly by the Court of Appeals -- was a decision as a matter of law. And nothing in Celsis' later submissions on the current motion calls for alteration of that conclusion.

In sum, although LTC's counsel have occupied 10 pages of text in their Reply Memorandum on the subject (Dkt. 278) and another 3-1/2 pages in their objection to Celsis' effort to change the outcome through still another submission, the entirely persuasive arguments advanced in those filings simply drive additional nails into the already-tightly-sealed coffin that has interred Celsis' claim of infringement by LTC's newly developed process. Hence LTC is entitled to a judgment as a matter of law as to the noninfringement of Celsis' patent by LTC's elutriation process, and this Court so orders.

## **Willful Infringement?**

In an odd way, the second branch of LTC's motion for summary judgment calls on this Court to look to an opinion that disagreed with its own views in this litigation. In that respect there is no mystery as to the Federal Circuit's standard for determining the existence or nonexistence of willful infringement -- here is what <u>In re Seagate Tech., LLC</u>, 497 F. 3d 1360, 1371 (Fed. Cir. 2007) held in that court's en banc decision overruling its earlier less demanding standard:

> Accordingly, we overrule the standard set out in *Underwater Devices* and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness.

And more recently Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 682 F. 3d 1003, 1005-06 (Fed. Cir. 2012) elaborated on the Seagate-established test:

> Because Supreme Court precedent requires a showing of recklessness before civil punitive damages are allowed, *Seagate* overruled this court's previous standard for willfulness, which was "more akin to negligence." *Id.* at 1371. *Seagate* established a two-pronged test for establishing the requisite recklessness. *Id.* Thus, to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* Once the "threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.* The *Seagate* court "le[ft] it to future cases to further develop the application of this standard. *Id.* Following *Seagate*, this court established the rule that generally the "'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F. 3d 1305, 1319 (Fed. Cir. 2010). Thus, the question on appeal often posed is whether a defense or noninfringement theory was "reasonable." *See, e.g., Powell v. Home Depot U.S.A., Inc.*, 663 F. 3d 1221, 1236 (Fed. Cir. 2011).

Although Bard, id. at 1006 went on to say that the "ultimate question of willfulness has long been treated as a question of fact," the circumstances of this case illustrate that such a characterization is not universal, for objective recklessness can be "a purely legal question to be determined by the judge" (id. at 1007). And in this case Circuit Judge Arthur Gajarsa (who incidentally authored the Bard opinion for the panel there) had dissented from the Federal Circuit's panel decision that upheld this Court's ruling as to the validity of the Celsis patent -- in his view "all of the claimed elements [of Celsis' asserted invention] were present in the prior art" (664 F. 3d at 933), and "the claimed invention is nothing more than a repetition of steps already known in the art" (id. at 935).

- 4 -

LTC also claims to have another string to its bow on the willfulness issue, pointing to the decision by the PTO to reconsider Celsis' patent. But this Court need not explore that issue, for Judge Gajarsa's dissenting opinion is enough. Celsis' counsel misses the mark entirely in arguing that LTC "did not and could not rely on either of these post-litigation factors when it began infringing the '929 patent -- the relevant point in time for determining its willfulness" (Celsis' Opposition Mem., Dkt. 257 at 1). That is of course nonsense, for the key issue in the analysis is not the time sequence but rather the fact that the dissenting opinion conclusively establishes that LTC's non-willfulness argument cannot be viewed as objectively reckless.[4]

So far, then, Celsis has gone 0 for 2. LTC is entitled to a summary judgment as to the nonwillfulness of its infringement of the Celsis patent before it later developed its own elutriation process. This Court so orders.

## Damages Issues

Both issues dealt with to this point have related to the turnaround in this litigation in LTC's favor after Celsis' original victory on the infringement front. In part because the substantive area favorable to LTC has been the most recent subject matter addressed by this Court, what has gone before in this opinion has demonstrably required little fresh analysis on this Court's part.

Now however LTC's third summary judgment motion compels a return to the earlier point in the litigation, for it relates to the damages recoverable by Celsis for the infringement

---

[4] Celsis' position as to the purported unreasonableness of LTC's position regarding the invalidity of Celsis' patent, which coincided with the position later taken by Judge Gajarsa, is essentially the equivalent of the position of a Justice who, writing for a five-Justice majority over the vigorous dissent of a four-Justice minority, would include in his opinion a statement that no reasonable person could arrive at a conclusion other than that reached by the majority.

before LTC engineered around the Celsis patent by developing its elutriation process. There are two questions in this third area:

1. To what extent if any can Celsis recover royalty damages for the period between the publication of its patent application and the issuance of the patent?

2. Can Celsis recover damages based on LTC products made before the issuance of the patent but offered for sale, sold or used after such issuance?

As to the first of those questions, 35 U.S.C. § 154(d)[5] provides a patentee with a "provisional right to obtain a reasonable royalty from any person" who practices the art taught in the patent while having "had actual notice of the published patent application" -- but Section 154(d)(2) expressly limits that provisional right:

> The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

Because whether claims are "substantially identical" is a question of law (see, e.g., Laitram Corp. v. NEC Corp., 163 F. 3d 1342, 1346-47 (Fed. Cir. 1998)),[6] both parties agree that (as the Introduction to Celsis' responsive memorandum says at page 1):

> The issue of provisional rights is a legal question ripe for summary adjudication.

---

[5] All further citations to provisions of Title 35 will simply take the form "Section --," omitting the prefatory "35 U.S.C."

[6] Although Laitram stated that proposition in the context of Section 252 (that is, as to a reexamined patent), the courts regularly draw on that caselaw in determining the standard for "substantially identical" under Section 154(d). In another demonstration of a too-rare accord between counsel for the competing parties, Celsis' Mem. 7 n.1 also agrees that the Section 252 caselaw applies to the Section 154(d) analysis.

Indeed, Celsis' response is coupled with its own cross-motion for a partial summary judgment adjudication of the "provisional rights" issue.

To apply the "substantially identical" requirement, both parties agree that the key inquiry is as to the difference between (1) the originally published version of what later became claim 1 of the issued patent and (2) the as-issued version of that claim. Here to facilitate that comparison is the latter version, with the additions to the originally-published version (after two rounds of rejection by the patent examiner) indicated by underlining:

> A method of producing a desired preparation of multi-cryopreserved hepatocytes, said hepatocytes being capable of being frozen and thawed at least two times, and in which greater than ~~50%~~ <u>70%</u> of the hepatocytes of said preparation are viable <u>after the final thaw</u>, said method comprising: (A) subjecting hepatocytes that have been frozen and thawed to density gradient fractionation to separate viable hepatocytes from non-viable hepatocytes, (B) recovering the separated viable hepatocytes, and (C) cryopreserving the recovered viable hepatocytes to thereby form said desired preparation of hepatocytes <u>without requiring a density gradient step after thawing the hepatocytes for the second time, wherein the hepatocytes are not plated between the first and second cryopreservations, and wherein greater than 70% of the hepatocytes of said preparation are viable after the final thaw</u>.

Where the parties differ (of course) is as whether those changes narrow the claim so as to destroy Celsis' contention of substantial identity.

Although LTC contends otherwise, it is at least arguable that adding the words "after the final thaw" clarified what was implied in the claim before that language was inserted. After all, for Celsis' method to have value, the viability of the hepatocytes must exist after the freezing-and-thawing process has been completed (not at some intermediate point), so that the express insertion of the quoted language could be said to have constituted a clarification rather than a substantive alteration of the claim's scope.

By sharp contrast, that cannot conceivably be said as to the other additions made to produce the final claim. Celsis offers the feeble excuse that the amendment in response to the

examiner's rejection of the initial application claim "did not modify the scope of the claimed invention" -- but when its representative was before the patent examiner, Celsis argued that the prior art references "failed to teach the claimed invention" because they "failed to teach that hepatocytes can be multiply-cryopreserved, so as to maintain a high viability over 70%, without requiring a second Percoll density gradient and without plating the hepatocytes by cryopreservation steps." And LTC has put the lie to Celsis' contention by providing chapter and verse in its Reply Memorandum at 3-6 through specific examples of how the Celsis amendments narrowed the claim.

In short, it is beyond dispute that the patent's claim 1 as amended is <u>not</u> "substantially identical" to the pre-amendment published claim. Celsis' attempt to attach the euphemistic label of "clarifying" in place of the real-world significance of its pre-issuance amendments simply will not fly. LTC's motion for summary judgment on that score must be and is granted, while Celsis' countermotion is of course denied.

Finally, LTC urges that Celsis cannot seek or obtain damages based on any LTC products that were made before the patent's issuance, even if those products were offered for sale, sold or used after issuance. That is so because the claims as issued cover a <u>method</u> -- a process -- of producing a hepatocyte preparation -- that is, they do not claim the preparations themselves or the use of the preparations. That being the case, Federal Circuit caselaw teaches that "domestic entities do not infringe a process patent if they practice the process before the beginning of the patent term, even if they sell the products of the process during the term of the patent" (<u>Monsanto Co. v. Syngenta Seeds, Inc.</u>, 503 F. 3d 1352, 1360 (Fed. Cir. 2007)). And <u>Monsanto</u>, <u>id</u>. went on to cite the Federal Circuit's earlier decision in <u>Joy Techs., Inc. v. Flakt, Inc.</u>, 6 F. 3d

770, 774 (Fed. Cir. 1993) (emphasis added) as having "explained that a method or process claim is directly infringed only when the process is <u>performed</u>."

Perhaps unsurprisingly, Celsis' responsive memorandum does not quarrel with that proposition -- it urges instead that LTC's motion in that respect is "premature" because discovery is needed (Celsis claims that LTC "accelerated the manufacture of its products" before the patent issued). But LTC's Reply Memorandum at 9-10 reminds us that the parties filed cross-motions for summary judgment on the issue of provisional rights, and this opinion has ruled that such damages are uncollectible because of the lack of substantial identity between the published patent application and the issued patent. In addition to this Court's ruling on those crossmotions, then, it denies Celsis' Fed. R. Civ. P. 56(f) motion.

                                                */s/ Milton I. Shadur*
                                            Milton I. Shadur
                                            Senior United States District Judge

Date: February 13, 2014